**UNITED STATES, Appellee,**

v.

**Specialist Michael T. BROSIUS, 198–54–5517, United States Army, Appellant.**

**ACMR 9002732.**

U.S. Army Court of Military Review.

10 May 1993.

For Appellant: Joseph W. Kastl (argued); Captain Edward T. Keable, JAGC, Captain Christopher W. Royer, JAGC (on brief).

For Appellee: Major Joseph C. Swetnam, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Joseph A. Russelburg, JAGC, Lieutenant Colonel Thomas E. Booth, JAGC USAR, Captain Marcus A. Brinks, JAGC (on brief).

Before CREAN, WERNER, and GONZALES, Appellate Military Judges.

## OPINION OF THE COURT AND ACTION ON PETITION FOR NEW TRIAL

WERNER, Judge:

Though charged with premeditated murder, the appellant was convicted, contrary to his pleas, by a general court-martial composed of officer and enlisted members of unpremeditated murder in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 (1982) [hereinafter UCMJ].[1] The court sentenced him to a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority commuted the confinement portion of the sentence to seventy-five years and approved the remainder of the adjudged sentence.

In this appeal, we address the following assignments of error:

I. The evidence is legally insufficient to establish the offense of unpremeditated murder.

II. The military judge erred in admitting an uncorroborated pretrial statement from the appellant to military crim-

---

1. He also pled guilty to communicating a threat to kill a commissioned officer in violation of Article 134, UCMJ, 10 U.S.C. § 934 (1982).

inal investigators in which he confessed to Tammy Ivon's murder.

III. The military judge erred in denying a defense motion to suppress certain incriminating pretrial statements in violation of his rights under the 5th and 14th Amendments.

IV. The military judge erred in failing to dismiss charges pursuant to Rule for Courts–Martial 707 [hereinafter R.C.M.] on grounds that the appellant had been held in arrest for more than ninety days.

This court also specified the question of whether the appellant's plea of guilty to wrongfully communicating a threat was provident.

Having considered the arguments and briefs of counsel for the parties, and having reviewed the entire record, we determine that none of the assigned errors have merit. Moreover, with regard to the specified issue, we find that the appellant's guilty plea was provident.

I. The Prosecution's Case

On the morning of 2 June 1990 at about 0440 hours, two sergeants walking near the parking lot adjacent to the enlisted servicemembers' barracks on Giebelstadt Kaserne, Germany, observed a pair of legs protruding from beneath a pickup truck. Upon investigating, they discovered that the legs belonged to Private First Class (PFC) Tammy Ivon who was seriously injured from numerous knife wounds inflicted upon her by an unknown assailant. One of the sergeants, First Sergeant (1SG) Gentry, observed that although she was breathing, PFC Ivon's pulse was weak, she was moaning, her head twitched, and she appeared to be in shock. Her jeans were pulled down to her ankles.

First Sergeant Gentry asked two passersby for help in assisting PFC Ivon. One of them, PFC Sherard, crawled under the truck to render first aid. He observed that

her pulse was faint, she moved her hands and opened her eyes. She appeared to have been bleeding extensively but the blood had dried on her body and clothing. Her shirt was torn and lay open. Her jeans, which were pulled down to her ankles, had been cut through at the pelvic area. Her undergarments appeared to have been cut from her body and lay under her. First Sergeant Gentry told PFC Sherard to get a blanket. As he arose, PFC Sherard noticed an individual staring at him from a road abutting the parking lot. The two stared at each other for ten to fifteen seconds before the individual quickly walked away into the treeline. At trial, PFC Sherard insisted that, although it was twilight, he saw the individual clearly enough to identify him as the appellant.[2]

At about 0507 hours, a medic who had arrived on the scene pulled PFC Ivon's body from beneath the truck and attempted to revive her. Although he felt a slight pulse, he observed that she had a sucking chest wound and was not breathing. Despite his resuscitative efforts, PFC Ivon did not regain consciousness and died from her wounds.

An autopsy conducted by a military pathologist, Doctor (Dr.) Marzouk, revealed that PFC Ivon died as a result of loss of blood from multiple stab wounds to her vital organs from a single-edged knife approximately three quarters of an inch wide and five inches long. The killer had stabbed her four times in the chest, five times in the abdomen, and had slashed her once in and around each eye. The autopsy report states, "The stab wounds did not lacerate the eye globes. The stab wound went lateral to the eye globe in the left eye, and above the eye globe in the right eye." From the angle of entry of the weapon, Dr. Marzouk concluded that PFC Ivon had been lying on her back when the fatal

---

**2.** The appellant had moved to suppress PFC Sherard's in-court identification on the grounds that it was unreliable and that it was tainted by a suggestive pretrial lineup. *See Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *United States v. Quick,* 3 M.J. 70 (C.M.A.1977). The military judge correctly denied the motion as the evidence estab-

lished that PFC Sherard had the opportunity and time to identify the appellant uninfluenced by the lineup. Moreover, meteorological data admitted during the trial proved that, at that time of the morning on the day in question, there would have been sufficient light to enable PFC Sherard to make the identification.

blows were administered. The wounds to her chest were administered through her shirt and tank top; four of the wounds to her abdomen occurred after her garments were displaced or removed. There were abrasions and contusions on her neck and chin as well as hemorrhaging behind the eyes which, Dr. Marzouk surmised, may have been caused by strangulation. There were contusions on her knees and on the exterior of her genitalia. However, there was no evidence of motile sperm in or on her body. The autopsy report also noted that PFC Ivon's brassiere, tank top, panties and jeans had been cut through the center of each garment. Toxicological examination established the presence of a significant amount of alcohol in her blood but no evidence of drug use.

Dr. Marzouk testified in accordance with the autopsy report. He added that there was grass on PFC Ivon's clothing and the back of her head. In response to a question from the court, he opined that PFC Ivon could have lived for a period of up to one to two hours after she had been stabbed.

Later in the morning of 2 June, members of the Criminal Investigation Command (CID) secured the crime scene and interviewed potential witnesses on Giebelstadt Kaserne concerning the circumstances surrounding PFC Ivon's death. At the crime scene, they discovered PFC Ivon's car parked adjacent to the truck under which her body was discovered. Blood stains permeated the rear seat of her vehicle and a piece of her underpants was found on the floorboard. The CID also found a blood stain on the cab and camper-top of the truck. There was no forensic evidence to establish the identity of PFC Ivon's killer. Nor was the murder weapon found.

The CID first came into contact with the appellant when he approached them on 2 June with information about PFC Ivon's death. The appellant's roommate, Private (PVT) Casero, testified that he was awakened about 1110 hours by the appellant yelling, "Sparks did it." The appellant explained that he was referring to the death of PFC Ivon and that he believed that her boyfriend, PVT Sparks, was the perpetrator. The appellant also gave this information to his first sergeant who referred him to Special Agent (SA) Allen, the CID agent conducting the investigation at Giebelstadt. The appellant reported that PFC Ivon gave him a ride back to the barracks from an off-base dance club on the night she was killed and that a third person was in the car with them. The appellant refused to identify the third person until "his first sergeant or a lawyer or someone with his interests" was present to insure that the information was properly documented. Special Agent Allen, who was busy with other witnesses, instructed the appellant to make his report to investigators at the CID office in Wuerzburg.

The appellant complied with SA Allen's instructions. At the CID office, he was interviewed by SA Nash. In compliance with the appellant's request, Captain (CPT) Ewing, a judge advocate known by the appellant because he had given him legal advice on a civil law matter two years earlier, was present. The appellant knew that CPT Ewing was a prosecutor but did not object to him being present.

At about 2200 hours, 2 June, the appellant made a written statement in which he stated that he was a close friend of PFC Ivon and that he saw her on the evening of 1–2 June at the Rock Palace dance club in Wuerzburg. There, they chatted and danced together. At 0200 hours, 2 June, she gave him and another soldier a ride back to Giebelstadt Kaserne where they entered through the back gate and showed their identification cards to the gate guard. He described the soldier in detail and noted that he sat in the rear of the vehicle behind PFC Ivon, said nothing, and just stared straight ahead the entire trip. After arriving at the barracks parking lot at about 0225 hours, he and the soldier went into their respective barracks while PFC Ivon remained in the vehicle because she did not want her boyfriend to see her with them.

The sign-in log for the back gate indicated that PFC Ivon's vehicle was driven onto Giebelstadt at 0230 hours and that there were only two persons in the vehicle. As a

result of this discrepancy, the CID decided to reinterview the appellant as a suspect. On 4 June, after being warned of and waiving his rights under Article 31, UCMJ, and the Fifth Amendment, the appellant agreed to answer questions posed by SA Blackmon. Special Agent Blackmon testified that appellant reiterated his earlier version of the events of the evening of 1–2 June. However, when asked pointed questions, the appellant became physically agitated and persisted in giving vague answers. Special Agent Blackmon determined that further inquiry would be unproductive and terminated the interview.

On 5 June, the appellant was again interviewed by the CID, this time by SA Dumond. After again waiving his rights, he reluctantly but definitively confessed, in writing, to killing PFC Ivon. In this statement, the appellant restated that PFC Ivon gave him a ride back to the barracks from the Rock Palace, that they showed their identification cards to the gate guards and that they parked in the barracks parking lot. Then, in the key portion of his confession, the appellant stated that there was no third person in the vehicle. He then described the circumstances of the homicide:

[S]he bent down to pick up her purse. And also the spiked wrist band, she had on the floor. And, in the process of her doing that, she touched my leg. We both then climbed out of the car and jumped in the back of the car. We started having sexual intercourse, making love. I realize it, wasn't right. So, I tried stopping her. I started stabbing her with the knife in the chest and the stomach. She kept on looking at me, so I took the knife and went across her eyes, so she would stop looking at me. I got out of the car and went towards the barracks. I went through the side door, I couldn't get in to the first floor, so went to the second floor. When I went on the second floor, all the lights were out. Thats when I saw SPC Heeter. He was drunk walking down the hallway. He ask who I was. So, I gave him my name. He said he was drunk, and I said, at least you are doing better then me, I'm sober. Then I went from there down the other steps

pass the C.Q. desk. I went to my room and took off my clothes and went to bed.

In response to specific questions posed by SA Dumond, the appellant admitted that he killed PFC Ivon because "she's like a sister to me. It's not right having sexual intercourse. Its like incest." He claimed not to remember what kind of knife he used or whether he cut PFC Ivon's clothing. He believed that he stabbed her about nine times but could not particularize the number of times he stabbed her in the chest and stomach. In concluding, the appellant stated, "I don't believe I did it and if I did I want help. I feel like I falsified the whole statement."

Several witnesses testified to having seen the appellant behaving oddly on the morning of PFC Ivon's death. Private Casero testified that he believed the appellant had not returned to his room that evening. He noted that the appellant's bed was made when he was awakened by the appellant at about 1110 hours. However, beds were not required to be made on weekends. He also observed that there was a pile of laundry nearby.

At 0725 hours, Specialist (SPC) Joseph was walking to his post as a guard when he saw the appellant coming towards him from the direction of the bowling alley and recreation center. However, both facilities were usually closed at that hour. The appellant appeared shocked and dazed and mumbled a greeting to him.

At 0730 hours, PFC Reckers, the unit armorer who had just issued SPC Joseph his weapon, was taking a smoke break outside the barracks when she saw the appellant come out of the treeline and enter the building. He said that he had been to the gym to work out. Private First Class Reckers had worked at the gym and knew it was closed at that time.

At about 0730–0800 hours, SPC Bajorek saw the appellant putting two tires into a dumpster. He seemed angry and upset and had a strange look in his eyes. He said that the girl who had given him a ride home two hours earlier was dead. He suspected her boyfriend, PVT Sparks, had

killed her and the appellant threatened to kill him.

At about 0830 hours, PFC Risinger encountered the appellant at the barrack's snack machine and asked him if he had heard about PFC Ivon's death. The appellant said he had not. When PFC Risinger told him she had been stabbed, he replied, "You're kidding." At 1000 hours, PFC Risinger saw the appellant with his laundry bag. The appellant said he was going to the laundromat.

At 1100 hours, at the laundromat, the appellant told PFC Reckers that PFC Ivon gave him a ride home the previous evening and that he might have been the last person to see her alive. He said he had heard she was stabbed eleven times.

Specialist Tyner testified that as he passed PFC Ivon's car at about 0300 hours, he heard a "grunt or a groan or someone moving" in the car. The windows of the vehicle were fogged and he could not identify the individuals in it. However, he thought they were having sex.[3]

## II. The Defense's Case

The defense attempted to demonstrate that, notwithstanding his confession, the appellant was not the perpetrator. It presented evidence tending to indicate that another individual committed the crime. It also attacked the appellant's confession as uncorroborated and involuntary.

Special Agent Robinson testified that the appellant's confession of 5 June was incomplete or erroneous as to certain particulars. The appellant purportedly said that he cut PFC Ivon's mouth and cheek. He also said that he used a double-edged, olive drab knife.

Specialist Heeter testified that he saw the appellant on the second floor of the barracks around the time that PFC Ivon was killed. Although he had been drinking, he did not notice any blood on the appellant.

Private First Class Edge testified that she saw the appellant in the laundromat at about 1100 hours on 2 June. He told her about PFC Ivon's death and said that there had been a third person in the car with them when they returned to the barracks that morning. He described the individual as big, blond and wore glasses. However, during cross-examination, PFC Edge said that the appellant related certain particulars of the crime that indicated he had detailed knowledge of the crime scene. For example, he stated that PFC Ivon's legs were sticking out from beneath the pickup truck; she had been stabbed in the chest and stomach nine times; her jeans had been cut and were pulled down around her boots; and, there was blood on the side of the truck. Private First Class Edge did not ask how he had obtained this information.

Several defense witnesses suggested PVT Sparks may have had a motive to kill PFC Ivon. They testified that he was a jealous boyfriend and threatened to kill her if she dated other men. His roommate testified he owned a hunting knife. After his arrest, PVT Sparks told his roommate that PFC Ivon had been stabbed eleven times. Other witnesses suggested there was another unidentified individual who may have been the perpetrator. After PFC Ivon's body was discovered, a medic saw a strange man pacing back and forth in the parking lot. Later he saw the individual in the mess hall staring into space. Another witness saw a white man in cowboy boots and jeans walking near the barracks at about the time PFC Ivon was killed.

The appellant's mother testified that he had called her in the United States the evening of 2 June. He told her about PFC Ivon's death and related that she had given him and a third person a ride back to the barracks. He described the individual as he did for SA Nash, silent and staring straight ahead. Later that week he told his mother that CID "had his mind so messed up, that at a point he almost believed he did commit the crime." He said he signed a statement but that it was false.

3. Specialist Freeman, testifying for the defense, stated that, at about 0230–0240 hours, as he returned to the barracks, he observed two individuals in a parked car and it appeared they were having sex.

Private First Class Risinger was recalled and testified that PFC Sherard told him he could not identify the individual he saw staring at him near the barracks parking lot.

### III. Sufficiency of the Evidence

The appellant has styled his challenge to the sufficiency of the evidence in terms of legal sufficiency. The text of his argument, however, also raises the issue of factual sufficiency.

█ The test for legal sufficiency of the evidence is whether, considering the evidence in the light most favorable to the government, the trier of fact could rationally find the existence of every element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A.1991). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this Court is itself convinced of appellant's guilt beyond a reasonable doubt. UCMJ art. 66(c); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987).

█ We are satisfied of the legal and factual sufficiency of the evidence in this case. The government's case rested primarily on three evidentiary pillars: (1) the objective evidence establishing that PFC Ivon was stabbed to death sometime between 0230 and 0440 hours, 2 June 1990, in her automobile parked near the appellant's barracks and that the appellant had been with her at about the time of her death; (2) the observations of witnesses that the appellant was in the vicinity of the parking lot on the morning of 2 June, was behaving oddly at that time, and had knowledge of intimate details of the crime; and (3) the appellant's confession to the CID including his strange behavior during his confrontations with them.

In opposition, the defense pointed out that there was no forensic evidence—blood, hair, semen, fingernail marks, bruises—linking the appellant to the crime. Moreover, there was testimony from a witness,

SPC Heeter, who saw the appellant in the barracks at about the time PFC Ivon was killed and that the appellant had no blood on him. Specialist Heeter was, however, intoxicated at the time and his perception may have been impaired (in his statement of 5 June, the appellant indicated that the hall lights were out). There was evidence that the appellant was peaceable and a close friend of the victim. The defense's evidence also raised the possibility that another individual was the killer. Finally, the appellant asserted that his confession was haltingly made and ambiguous.

Despite the evidentiary conflict, the court members found that the evidence as a whole established the appellant's guilt beyond a reasonable doubt. We see no reason to alter that finding. The appellant's confession and the circumstances under which it was made contradict his assertion of innocence notwithstanding its ambiguity as to certain particulars. Moreover, there were other factors that tended to establish the appellant's guilt. These include: (1) his statement that a third person was in the vehicle when he and PFC Ivon arrived at the Kaserne was contradicted by the vehicle log maintained at the back gate indicating only two persons were in the vehicle; (2) his knowledge of the number of wounds on PFC Ivon and the manner in which her clothing was cut; and, (3) his knowledge of details about the crime scene, such as her legs protruding from beneath the truck and the blood on the truck. Accordingly, we reject this assignment of error.

### IV. Corroboration of the Confession

█ The appellant moved to suppress his confession of 5 June on grounds that it was not corroborated. Military Rule of Evidence 304(g) [hereinafter Mil.R.Evid.] provides in material part:

> An admission or a confession of the accused may be considered as evidence against the accused on the question of guilt or innocence only if independent evidence, either direct or circumstantial, has been introduced that corroborates the essential facts admitted to justify sufficiently an inference of their truth.... If the independent evidence

raises an inference of the truth of some but not all of the essential facts admitted, then the confession or admission may be considered as evidence against the accused only with respect to those essential facts stated in the confession or admission that are corroborated by the independent evidence....

In a recent decision involving the corroboration requirement of Mil.R.Evid. 304(g), the Court of Military Appeals held:

We have consistently held that it does not require independent evidence of the *"corpus delicti"* of the confessed offense (*see* 7 J. Wigmore, *Evidence* § 2072 (Chadbourn rev. 1978) for a discussion of that term) but, instead, that it requires independent evidence which establishes the trustworthiness of the confession. *United States v. Rounds*, 30 M.J. 76, 80–81 (C.M.A.), *cert. denied*, [498] U.S. [846], 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Melvin*, 26 M.J. 145 (C.M.A.1988); *United States v. Yeoman*, [25 M.J. 1 (C.M.A. 1987)]. These holdings are consistent with Supreme Court precedent and with practice in Federal civilian courts such that it can be realistically said in the Federal sector that the "corpus delicti" corroboration rule no longer exists. The bottom line is that the corroborating evidence must raise only an inference of truth as to "the essential facts admitted" in the confession. (citations and footnote omitted).

*United States v. Maio*, 34 M.J. 215, 218 (C.M.A.), *cert. denied*, —— U.S. ——, 113 S.Ct. 196, 121 L.Ed.2d 138 (1992).

The Court has also held, "Although no mathematical formula exists to measure sufficient corroboration, our review of the federal court decisions cited below leads us to conclude that the amount of corroboration generally needed is not great." *United States v. Melvin*, 26 M.J. at 146. On the basis of the foregoing criteria, we hold that the appellant's confession was sufficiently corroborated by independent evidence to establish its trustworthiness.

First, the objective evidence in the autopsy report confirmed the number and type of wounds the appellant admitted to having administered to PFC Ivon. He admitted that he stabbed her about nine times with a knife and that he "went across her eyes" so she would not look at him; the autopsy report was consistent with those admissions. The appellant admitted to having sexual intercourse with PFC Ivon; the autopsy report indicated her genital area was bruised. Moreover, two passersby testified that they thought two individuals were having sex in PFC Ivon's car at the approximate time of her death. Second, SPC Heeter corroborated the appellant's admission to having seen him in the barracks after stabbing PFC Ivon. Third, the testimony from several witnesses that the appellant said he had been to the gym and laundromat dovetailed with portions of the confession. Collectively, this independent evidence establishes that this assigned error is without merit.

## V. Admissibility of the Appellant's Pretrial Statements

The appellant contends that his pretrial statements to the CID on 2, 4, and 5 June should have been suppressed as they were obtained in violation of his right to the presence of legal counsel during their initial and subsequent custodial interrogations. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[4] We disagree.

It is undisputed that the appellant was advised of and waived his rights during the interrogations of 4 and 5 June. The CID agents conducting those interrogations, SA Blackmon and SA Dumond, testified that they suspected the appellant of killing PFC Ivon, gave him the requisite warnings, and obtained the appellant's consent to be interviewed and make a statement without counsel present. However, the appellant argues that those interrogations were

---

**4.** *See also United States v. Harris*, 19 M.J. 331 (C.M.A.1985); *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

tainted by the violation of his right to counsel by SA Allen and SA Nash during his meetings with them on 2 June. He maintains they should have reasonably considered him a suspect when he approached both agents with information about PFC Ivon's killing because he was emotionally upset and agitated, and they should have immediately advised him of his right to counsel. Furthermore, when he requested that his first sergeant or a lawyer be present to witness his statement, the agents should have obtained legal representation for him instead of bringing in a prosecutor.

■ Unfortunately for the appellant, the evidence does not support his characterization of the events of 2 June. The appellant was neither in custody nor reasonably suspected of killing PFC Ivon by the CID agents with whom he spoke on that date. The CID agents testified that the appellant voluntarily appeared before them as a friend of PFC Ivon wishing to provide them with information that might lead to the apprehension of her killer. The fact that he was distraught or grief-stricken would not lead a reasonable criminal investigator to have suspected him of an offense since that is not suspicious behavior from a friend of a crime victim.

■ Moreover, the appellant's request that a lawyer be present while he spoke with the CID did not, under the circumstances, constitute a request for legal counsel even assuming there was a custodial interrogation. Invocation of the right to counsel must be unequivocal and unambiguous. *United States v. Schake*, 30 M.J.

314, 317 (C.M.A.1990); *United States v. Dock*, 35 M.J. 627 (A.C.M.R.1992), *pet. granted*, —— M.J. —— (C.M.A.1993). While the appellant said that his purpose for requesting that CPT Ewing be present was to look out for "his interests," in context, he was referring to something other than his potential culpability for the killing. We therefore reject this assigned error as unmeritorious.

## VI. Speedy Trial

■ The appellant contends that he was improperly held in arrest for a period in excess of ninety days and that his motion to dismiss the charges for lack of speedy trial pursuant to Rule for Courts–Martial 707(d) and (e) should have been granted.[5] We agree with the military judge that the appellant was not denied a speedy trial.

The chronology surrounding the appellant's arrest and pretrial restraint was set forth in a stipulation of fact. The parties agreed that, after he confessed to killing PFC Ivon, the appellant was placed in a military police detention cell on 6 June. On 7 June, he was released to his unit where he was housed in the unit fire direction center (FDC) on Giebelstadt Kaserne for two days.[6] From 9 June to 12 June, the appellant received a psychiatric evaluation at a military hospital in Frankfurt. On 12–13 June, he was returned to the FDC on Giebelstadt before being relocated to the Initial Readiness Position (IRP) at Larson Barracks in Kitzingen, fifteen kilometers from Giebelstadt, where he remained until 21 July.[7] On that date, the charges were

---

**5.** At the time of the appellant's trial, R.C.M. 707(d) and (e) provided, in part:

(d) *Arrest or confinement.* When the accused is in pretrial arrest or confinement under R.C.M. 304 or 305, immediate steps shall be taken to bring the accused to trial. No accused shall be held in pretrial arrest or confinement in excess of 90 days for the same or related charges. Except for any periods under subsection (c)(7) of this rule, the periods described in subsection (c) of this rule shall be excluded for the purpose of computing when 90 days has run. The military judge may, upon a showing of extraordinary circumstances, extend the period by 10 days.

(e) *Remedy.* Failure to comply with this rule shall result in dismissal of the affected charges upon timely motion by the accused. Rule for Courts–Martial 707(d) and (e) was subsequently changed by Executive Order No. 12767, dated 27 June 1991, and incorporated as part of Change 5 to the Manual for Courts–Martial.

**6.** The FDC was described as a small military compound, forty yards square, with limited recreational facilities, surrounded by barbed wire.

**7.** The IRP was described as a "fenced in site ... approximately three city blocks wide ... with concertina on top, all the way around...." There was a barracks on the site that housed ninety-five soldiers.

preferred and the accused was ordered into pretrial confinement. Eighty days later, on 9 October, the initial session of the court-martial was held. The total time the appellant spent in pretrial restraint was one hundred and twenty-five days.

After a hearing, the military judge found that twenty-eight days of the period in which the appellant was restrained was excludable from governmental accountability pursuant to R.C.M. 707(c). He excluded twenty-seven days during which the appellant underwent mental evaluation under R.C.M. 707(c)(1)(A) and hospitalization as a suicide risk, and one day when there was no restraint.

The judge also determined that the thirty-three days during which the appellant was restricted to the IRP did not constitute restriction tantamount to arrest as the conditions of the appellant's restraint were not sufficiently onerous to support that determination. The evidence supporting the judge's ruling established that, the appellant was required to perform all military duties; was not deprived of personal items; was granted access to recreational facilities outside the IRP; and was assigned a separate room in a barracks on the IRP. The judge noted that the appellant could not leave the IRP unless he had an escort, that he was not allowed to wear civilian clothing and that his pass privileges were revoked for brief periods. However, on balance, these factors did not weigh as heavily in the judge's decision.

■■■■ In determining whether pretrial restriction constitutes pretrial arrest or confinement, this court has declined to articulate a "bright line" test. Instead, it looks at the totality of the circumstances surrounding the restraint. "As the terms of a pretrial restriction become increasingly onerous, the nature of the accused's pretrial restraint moves further along the spectrum between restriction and confinement, until it finally becomes restriction tantamount to confinement." (footnote omitted). *United States v. Gregory*, 21 M.J. 952, 955 (A.C.M.R.), *aff'd*, 23 M.J. 246 (C.M.A.1986). We find, as did the military judge, that the appellant's pretrial restraint

was not so onerous as to exceed the level normally representative of restriction. While restriction is a form of restraint which entitles an accused, upon conviction, to administrative credit, *see United States v. Russell*, 30 M.J. 977 (A.C.M.R.1990), or to dismissal of charges for a delay in excess of one hundred and twenty days, *see* R.C.M. 707(a), it does not justify dismissing charges for delays over ninety days. Accordingly, as the amount of time spent in pretrial arrest or confinement did not exceed ninety days, the appellant's motion to dismiss was properly denied.

## VII. Specified Issue

The question posed by the specified issue is whether the appellant's plea of guilty to wrongfully communicating a threat to kill a company commander, CPT Logan, on 12 May 1990 was improvidently entered when the appellant stated during the providence inquiry that he was intoxicated at the time he made the threat. We answer that question in the negative.

The appellant informed the military judge that he and some friends had been drinking alcoholic beverages late into the night when they began discussing the fact that one of their friends had been convicted for trafficking in narcotics. Angered at his friend's commanding officer for initiating disciplinary action, the appellant called the charge-of-quarters (CQ) and, in his drunken state, informed him of his intention to kill CPT Logan. The appellant admitted that he was "serious" in making the threat.

■■■■ Two principles of military law militate against rejecting the appellant's plea. First, a plea of guilty need not be set aside because the information elicited at trial raises only a possibility that a defense to the charge may exist. *United States v. Logan*, 22 U.S.C.M.A. 349, 47 C.M.R. 1 (1973). Rather, there must be a substantial basis for the defense. *United States v. Prater*, 32 M.J. 433 (C.M.A.1991). Second, voluntary intoxication is not a defense to a general intent crime since the unlawful act itself is presumptive of the accused's *mens rea*. R.C.M. 916(1)(2). Wrongful communication of a threat is such a general intent

crime and an accused's voluntary intoxication would not furnish him with an excuse for his misconduct. *United States v. Humphrys,* 7 U.S.C.M.A. 306, 22 C.M.R. 96 (1956). We note that voluntary intoxication could vitiate a guilty plea if it implicated a substantial basis for showing "that the declaration was made in jest or for some other innocent and legitimate purpose." *Id.* at 307, 97. However, the appellant's responses during the providence inquiry clearly negate that possibility.

### VIII. Petition for New Trial

The appellant also asserts that he should be granted a new trial on the basis of newly-discovered evidence. UCMJ art. 73; R.C.M. 1210(f)(2). In support, he has filed and we have admitted numerous appellate exhibits in support of his argument that someone other than the appellant may have killed PFC Ivon. Having examined these exhibits and considered the appellant's arguments, we deny his petition.

For a petition for a new trial to lie, the appellant has the burden of demonstrating that the "new evidence" was discovered after conclusion of the trial, that it was not discoverable through due diligence at the time of trial, and that it "would probably produce a substantially more favorable result for the accused." *Id.* We perceive nothing in the appellant's exhibits to lead us to conclude that the matters contained therein would enable the appellant to meet any portion of the tri-part test.

We have considered the remaining assignments of error to include those personally submitted by the appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

Accordingly, the findings of guilty and the sentence are affirmed. The appellant's Petition for a New Trial is denied.

Senior Judge CREAN and Judge GONZALES concur.