

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-23-2002

# Brosius v. Warden Lewisburg

Precedential or Non-Precedential:

Docket 1-1102

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

## Recommended Citation

"Brosius v. Warden Lewisburg" (2002). *2002 Decisions.* Paper 28.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/28

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 23, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1102

MICHAEL TODD BROSIUS,

      Appellant

v.

WARDEN, UNITED STATES PENITENTIARY,
LEWISBURG, PA

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

(Dist. Court No. 99-cv-01387)

District Court Judge: William W. Caldwell

Argued September 7, 2001

Before: BECKER, Chief Judge, ALITO, and
BARRY, Circuit Judges.

(Opinion Filed: January 23, 2002)

        PAUL M. POHL (Argued)
        Jones, Day, Reavis & Pogue
        500 Grant Street, Suite 3100
        Pittsburgh, PA 15219

        Counsel for Appellant

MAJOR DAN BROOKHART (Argued)
Department of the Army
Office of the Judge Advocate General
Government Appellate Division
901 N. Stuart Street
Arlington, VA 22203

Counsel for Appellee

OPINION OF THE COURT

ALITO, Circuit Judge:

This is an appeal by Michael Todd Brosius from an order dismissing his petition for a writ of habeas corpus. Brosius was convicted of unpremeditated murder following a general court martial, and he is serving a sentence of imprisonment. His conviction was affirmed by the Army Court of Military Review, see United States v. Brosius, 37 M.J. 652 (A.C.M.R. 1993), and the Court of Military Appeals granted review but summarily affirmed without opinion. See United States v. Brosius, 39 M.J. 378 (C.M.A. 1994). Brosius, who is imprisoned at the United States Penitentiary in Lewisburg, Pennsylvania, then filed a petition for a writ of habeas corpus under 28 U.S.C.S 2241 in the United States District Court for the Middle District of Pennsylvania. The District Court denied his petition, Brosius v. Warden, 125 F. Supp. 2d 681 (M.D.Pa. 2000), and this appeal followed.

I.

At approximately 4:40 a.m. on June 2, 1990, two sergeants in the United States Army found Private First Class Tammy Ivon near death in the parking lot adjacent to the enlisted service members' barracks at the United States Army Airfield in Giebelstadt, Germany. When Ivon was found, her legs were protruding from under a pickup truck, and her jeans had been pulled down to her ankles. One of the sergeants noticed a man whom he identified as Brosius staring at him from a nearby road. After several seconds,

2

Brosius, who had been a close friend of Ivon's, walked away. A short time later, Ivon died.

An autopsy revealed that Ivon had been stabbed 11 times, four times in the chest, five times in the abdomen, and once near each eye. Ivon's car was found parked next to the pickup, and the back seat of the car was stained with blood. The sign-in log for a gate on the base showed that Ivon's car had returned at 2:30 a.m. with two occupants. A witness who had passed Ivon's car at about 3:00 a.m. stated that the windows were fogged, he heard a grunt or groan coming from inside, and he thought that the occupants were having sex.

Numerous witnesses described Brosius's behavior during the hours after Ivon's body was found. A witness who saw him at 7:25 a.m. described him as shocked and dazed. At 7:30 a.m., he told another witness that he had just come from working out in the gym although the gym was closed at the time. He told another witness that a girl who had given him a ride home two hours earlier was dead and that he suspected her boyfriend. Brosius then reportedly threatened to kill the boyfriend. A short time later, when another witness asked Brosius if he had heard about Ivon's death, Brosius said that he had not. Brosius then went to the laundromat and told a witness who later testified for the prosecution that Ivon had given him a ride home that night and that he might have been the last person to see her alive. He said that he had heard that she had been stabbed 11 times. He told another witness who testified for the defense that a third person had accompanied Ivon and him when they drove back to the base. At 11:10 a.m., he awakened his roommate, screaming that Ivon's boyfriend had killed her.

Word reached Brosius's first sergeant that Brosius had been with the victim on the night of her murder, and the first sergeant then provided this information to agents from the Criminal Investigation Division ("CID"). Brosius was called to the orderly room, and Special Agents Douglas Allen and Tyrone Robinson took Brosius into the first sergeant's office and spoke with him. Brosius stated that on the night of the murder, Ivon had driven another soldier and him back to the base from a local club. When Special

Agent Allen asked the identity of the third person, Brosius replied that he did not wish to say anything about it. According to Special Agent Allen, Brosius then requested to have a lawyer, his first sergeant, or some other third party present to witness his statement. According to Brosius, he asked to have a lawyer present, but Brosius admitted that it was "possible" that he might have also mentioned his first sergeant. Special Agent Allen told Brosius that there were lawyers at the CID Headquarters ("the River Building") in Wuerzburg and that if he wanted to speak to a lawyer or someone else, he should go there. Sergeant Pickett, Brosius's section sergeant, drove him to the River Building. Sergeant Pickett and Brosius were acquaintances. App. 75.

At the River Building, Special Agent Mark Nash questioned Brosius without administering any warning of rights. Special Agent Nash told Brosius that the victim's boyfriend was the main suspect and that if Brosius "was worried about rights or anything being violated, if you start to say anything that we think would be incriminating against you, we would stop you and advise you of your rights." App. 19-20. Special Agent Nash told Brosius that Captain Harper Ewing would be available to witness the interview. Captain Ewing was the prosecutor assigned to the case.

When Captain Ewing arrived, Brosius recognized him as an attorney who had represented him in an earlier civil matter. Captain Ewing asked Brosius some questions about the prior representation in order to ascertain whether there was a conflict that would prevent him from prosecuting the case. Special Agent Nash and Captain Ewing both told Brosius that Captain Ewing was a prosecutor and was "working with the cops," but Brosius did not voice any objection. Captain Ewing acknowledged, however, that Brosius said something to the effect that he wanted an attorney present because he did not trust the police and feared that they would twist his words. App. 43-44. Captain Ewing testified that he thought that Brosius was simply requesting someone to record his words accurately and was not requesting legal representation, and Special Agent Nash testified that Captain Ewing was present at the interview for that purpose. Brosius did not ask Captain Ewing any

4

questions or request legal advice, but he testified at trial that he thought that Captain Ewing was his lawyer because Captain Ewing had represented him in an earlier matter and was present while he was being questioned.

At the end of the interview, Brosius signed a written statement. The chief points stated were that: 1) Ivon had given Brosius a ride back to the base from the club; 2) another male soldier, whom he described, had accompanied them; 3) Ivon had a troubled relationship with her boyfriend; and 4) Brosius had last seen her at about 2:55 a.m. Brosius's statement seems to have added little if anything of substance to what he had told other witnesses during the hours immediately after Ivon's body was discovered. The CID agents also took the clothing that Brosius had worn on the night of the murder, but it apparently did not yield any incriminating evidence. After the interview, Brosius returned to his unit.

Brosius returned for further questioning on June 4 and 5. At this time, he was warned of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and Article 31 of the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. S 83. After receiving these warnings, Brosius waived his rights and eventually confessed to the murder. He said that he had returned to the base with Ivon and that no one else was in the car. When they reached the parking lot, he stated, they started to have intercourse, but he realized that this "wasn't right" because she was "like a sister" to him. He stated that he stabbed her in the chest and stomach and then, because she was looking at him, in the eyes. He said that he stabbed her about nine times. At the end of the confession, however, he stated: "I don't believe I did it and if I did I want help. I feel like I falsified the whole statement."

II.

The degree to which a federal habeas court may consider claims of errors committed in a military trial has long been the subject of controversy and remains unclear. Nearly 50 years after it was decided, the Supreme Court's decision in Burns v. Wilson, 346 U.S. 137 (1953), is still the leading

5

authority. In Burns, two soldiers were tried by court martial, found guilty of murder and rape, and sentenced to death. They filed habeas petitions claiming that they had been denied due process of law. Some of the claims appear to have presented pure questions of fact (e.g. , whether the petitioners were beaten and denied food and sleep before they confessed), while other claims presented either mixed questions or questions of law (e.g., whether, on the undisputed facts, their confessions were coerced). The district court dismissed the petition, and the court of appeals affirmed. Burns v. Lovett, 202 F.2d 335 (D.C. Cir. 1952). The court of appeals applied the following standard:

> [H]abeas will not lie to review questions raised and determined, or raisable and determinable, in the established military process, unless there has been such gross violation of constitutional rights as to deny the substance of a fair trial and, because of some exceptional circumstance, the petitioner has not been able to obtain adequate protection of that right in the military process.

Id. at 342. Applying this standard, the court reviewed each of the petitioner's allegations and found that none warranted relief.

The Supreme Court affirmed by a vote of 6 to 2 but without a majority opinion. One member of the majority, Justice Minton, took the position that the Court could do no more than inquire whether the court martial had jurisdiction. Burns, 346 U.S. at 146–48 (Minton, J., concurring in judgment). However, the plurality opinion written by Chief Justice Vinson and joined by three other Justices concluded that the Court's inquiry was somewhat broader. The plurality stated that the petitioners' allegations "were sufficient to depict fundamental unfairness" and that the district court could have reviewed these claims de novo if the military courts had "manifestly refused to consider" them. Id. at 142. But because the military courts had "heard petitioners out on every significant allegation" and had "given fair consideration to each of the[ir] claims," the plurality stated, the petitioners had "failed to show that this military review was legally inadequate." Id. at 144–46. The plurality added that

"although the Court of Appeals may have erred in reweighing each item of relevant evidence in the trial record, it certainly did not err in holding that there was no need for a further hearing in the District Court." Id. at 146. Justice Jackson, the sixth member of the majority, concurred in the result without opinion. Id.

Justice Douglas, joined by Justice Black, dissented, arguing that it was proper to determine in the habeas proceeding whether, based on the undisputed facts, viz., that the petitioners had been held incommunicado and repeatedly questioned over a period of five days, the petitioners' confessions had been unconstitutionally obtained.[1] Burns, 346 U.S. at 154-55 (Douglas, J., dissenting).

Although the rule that emerges from Burns is far from clear in all respects, it appears that a majority (the plurality plus Justice Minton) held that in considering a constitutional claim involving a pure question of law or a mixed question of law and fact, a habeas court may not exercise de novo review and may not go beyond considering whether the military courts "dealt fully and fairly" with the claim. Moreover, the plurality's treatment of the petitioners' coerced confession claim suggests that full and fair consideration was intended to mean no more than "hear[ing]" the petitioners "out." Burns, 346 U.S. at 144. Although it appears that the Judge Advocate General, then the highest reviewing officer, had not addressed the question whether the undisputed facts relating to the confessions established a violation of the governing Supreme Court precedent concerning unconstitutionally coerced confessions,[2] the plurality rejected the coerced confession claim with the simple statement that "there was exhaustive inquiry into the background of the confessions -- with the taking of testimony from the persons most concerned with the making of these statements." Id. at 145.

_____

1. The ninth Justice, Justice Frankfurter, did not vote to affirm or reverse but stated the Court should have put the case down for reargument. 346 U.S. at 150.

2. See Burns, 346 U.S. at 154-55 (Douglas, J., dissenting).

7

Lower courts have had difficulty applying the Burns "full and fair" test. The Tenth Circuit, which has the most experience with habeas petitions filed by service members due to the location of the Disciplinary Barracks at Ft. Leavenworth, Kansas, has stated that "[t]he federal courts' interpretation -- particularly this court's interpretation -- of the language in Burns has been anything but clear." Dodson v. Zelez, 917 F.2d 1250, 1252 (10th Cir. 1990); see also, e.g., Kauffman v. Sec. of the Air Force, 415 F.2d 991, 997 (D.C. Cir. 1969) (the test "has meant many things to many courts").

Our court's treatment of Burns has also been far from seamless. In United States ex rel. Thompson v. Parker, 399 F.2d 774 (3d Cir. 1968), we interpreted Burns narrowly. The petitioner argued that his confession had been obtained in violation of the Fifth Amendment and Article 31 of the UCMJ, but we rejected that argument with the terse statement that "the district court, after determining that the military courts had given due consideration to petitioner's contentions, quite correctly refused to review and reevaluate the facts surrounding petitioner's allegations." Id. at 776.

By contrast, in Levy v. Parker, 478 F.2d 772 (3d Cir. 1973), rev'd on other grounds, 417 U.S. 733 (1974), we seemingly read Burns more expansively. Levy, a military doctor, was convicted by a general court martial of wilful disobedience of the lawful command of a superior officer, uttering public statements designed to promote disloyalty and disaffection among the troops, and wrongfully and dishonorably making intemperate, defamatory, provoking, contemptuous, disrespectful, and disloyal statements to other officers. See id. at 778. He contended that the articles under which he was convicted were too vague to satisfy due process. We suggested that a habeas court may examine de novo those constitutional claims "not dependent upon any evidentiary or factual construction." Id. at 783. The actual holding of the case, however, was limited to claims related to "the facial unconstitutionality of [a] statute" under which a petitioner was charged. Id. Any broader reading of Levy as requiring de novo review over all questions of law would be inconsistent with Burns, in which a majority of the

8

Court (the plurality plus Justice Minton) applied a deferential standard of review to the claims that, on the undisputed facts, the habeas petitioners' constitutional rights were violated. See Burns, 346 U.S. at 154 (Douglas, J., dissenting) (arguing that "the undisputed facts in [the] case ma[de] a prima facie case that [the Supreme Court's] rule on coerced confessions expressed in Watts v. Indiana, 388 U.S. 49, was violated").

In the present case, we find it unnecessary to attempt any further explication of Burns. Whatever Burns means, we have no doubt that at least absent a challenge to the constitutionality of the statute under which the defendant was convicted, such as that raised in Levy, our inquiry in a military habeas case may not go further than our inquiry in a state habeas case. See Burns, 346 U.S. at 142 ("In military habeas corpus cases, even more than in state habeas corpus cases, it would be in disregard of the statutory scheme if the federal civil courts failed to take account of the prior proceedings . . .") (emphasis added). Thus, we will assume -- but solely for the sake of argument -- that we may review determinations made by the military courts in this case as if they were determinations made by state courts. Accordingly, we will assume that 28 U.S.C. S 2254(e)(1) applies to findings of historical fact made by the military courts. Under this provision, "a determination of a factual issue made by a State court" is "presumed to be correct," and a habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." In considering other determinations made by the military courts, we will assume that 28 U.S.C. S 2254(d) applies. Under this provision,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

See also Williams v. Taylor, 529 U.S. 362 (2000); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999) (en banc).

III.

Brosius argues that his conviction must be reversed because, prior to his two interviews on June 2, he was not given the warnings prescribed by Miranda or Article 31(b) of the Uniform Code of Military Justice, 10 U.S.C.S 831(b).3 Article 31(b) differs from Miranda in that it requires warnings whenever a service member is "suspected of an offense" and is being interrogated. It may thus apply in situations in which a service member is not in "custody." See United States v. Baird, 851 F.2d 376, 383 (D.C. Cir. 1988). We will discuss Miranda and Article 31(b) separately.

A.

In Miranda, the Supreme Court held that warnings must be administered before a person is subjected to "custodial interrogation," i.e., "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444 (footnote omitted). In this case, the Army Court of Military Review concluded that Brosius was not in "custody" when he was interviewed on June 2, and the court credited testimony that Brosius "voluntarily appeared before [the CID agents] as a friend of PFC Ivon wishing to provide them with information that might lead to the apprehension of her killer." 37 M.J. at

_____

3. This provision states:

> No person subject to this chapter may interrogate, or request any
> statement from, an accused or a person suspected of an offense
> without first informing him of the nature of the accusation and
> advising him that he does not have to make any statement
> regarding the offense of which he is accused . . . .

10

660. Whether a person is in "custody" for purposes of Miranda is not a factual question entitled to the presumption of correctness, see Thompson v. Keohane, 516 U.S. 99 (1995), and therefore we ask whether the determination of the military courts that Brosius was not in custody is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1). We hold that under these standards, the determination of the military courts must be sustained.

Brosius argues that he was in custody at the time of the first interview on June 2 because his first sergeant, the highest-ranking noncommissioned officer in the unit,"sent" him to the orderly room to speak with the CID agents and because under Article 91(2) of the UCMJ, 10 U.S.C. S 891(2), Brosius was required to obey the first sergeant's orders. In making this argument, Brosius relies on the statement of Special Agent Allen that the first sergeant "sent" Brosius to the orderly room. However, when Special Agent Allen's testimony on this point is viewed in context and together with other pertinent testimony, it is apparent that there is no basis for overturning the Army Court of Military Review's determination that Brosius appeared before the CID agents voluntarily.

Special Agent Allen testified as follows:

> A. . . . [T]he First Sergeant told us there was a soldier that stated that he was with her the night before, and he asked if we wanted to see him. We said, "Yes if he's in the area you can send him down."
>
> Q. Okay. So the First Sergeant sent him down to the orderly room?
>
> A. Yes, sir.

App. 1.

Special Agent Nash explained the circumstances that led to Brosius's being "sent" to the orderly room. 4 Special Agent

_____

4. Special Agent Nash's testimony on this point was apparently hearsay. Under Mil.R.Evid. 104(a), a trial judge is not bound by the rules of

11

Nash testified that Brosius "approached some of our agents or the First Sergeant, and the First Sergeant approached our agents while they were in the unit, saying that he was with PFC Ivon, and that he wanted to come and tell us what he knew about it." App. 18; see also id . at 30. When Brosius was asked how he had come to be interviewed at the base, he stated "[s]omebody from the orderly room . . . came down to my room where I was at the time, and said that the police, CID, wanted to speak to me about what happened the night before." App. at 80.

Viewing all of this evidence together, we see no basis for rejecting the determination of the Army Court of Military Review that Brosius appeared voluntarily. Special Agent Nash's testimony directly supports that determination, and Special Agent Allen's use of the term "sent" is easily reconcilable with his testimony. A person who has expressed a desire to speak with someone may be"sent" to see that person when the person is available. ("After some time in the waiting room, the patient was sent  in to see the doctor.")

We thus then turn to the second interview conducted on June 2 at the River Building. Brosius argues that he was in custody at the time of this interview because, according to the opinion of the Army Court of Military Review, Special Agent Allen "instructed" Brosius to go to the River Building, 37 M.J. at 655, and, according to testimony given by Special Agent Robinson, Brosius was then "escorted" to the River Building by his section sergeant. App. 123. Brosius contends that, in the military, the word "escort" is synonymous with the word "guard." The government, by contrast, argues that Brosius had a friendly personal relationship with his section sergeant and that the sergeant simply gave him a ride to the River Building.

_____

evidence other than those pertaining to privileges and may consider hearsay in a suppression hearing. See United States v. Dababneh, 28 M.J. 929, 934 (N.M.C.M.R. 1989) quoting Bourjaily v. United States, 483 U.S. 171, 178 (1978). Hearsay may be considered in a suppression hearing in a federal court. United States v. Raddatz, 447 U.S. 667, 679 (1980).

The Army Court of Military Review, as previously noted, concluded that Brosius voluntarily appeared before the CID agents, and we accept that determination. Special Agent Allen testified as follows concerning the circumstances that led to Brosius's appearance at the River Building:

> Q. . . . [W]hen he said that. . . he didn't want to talk to you, what did you do?
>
> A. Well, we had several other people to talk to, and I told him "There's two lawyers down at the River Building," you know, if he wanted to talk to a lawyer about it or if he wanted to talk to someone about it , "go down there and someone would be glad to talk to you about it.

App. 4-5. (emphasis added). Special Agent Allen added:

> A. . . . I said, "Well, if you don't want to talk to us, there are attorneys down at the River Building right now, and if you want to go down there and talk to them about it, go ahead."
>
> Q. And then they did he?
>
> A. I think he did. He had a Sergeant there with him. I think it was his section Sergeant, whatever. I think he took him down there.

App. 13 (emphasis added).

Brosius himself said little about the circumstances that brought him to the River Building, stating only that his section sergeant, who was "an acquaintance," gave him a ride to that facility. App. 75.

Considering the relevant portions of the record that have been brought to our attention, we see no basis for rejecting the determination of the Army Court of Military Review that Brosius was not in custody when he spoke with the agents at the River Building. According to Special Agent Allen, Special Agent Robinson and he did not direct Brosius to go to the River Building but merely told him to go there "if he wanted to talk to a lawyer about it or if he wanted to talk to someone about it." Brosius himself does not appear to have testified that he felt compelled to go to the River Building. Since the River Building was about 12 miles from

13

the base, Brosius needed transportation to get there. Special Agent Robinson's use of the term "escorted" may simply mean that the section sergeant gave him a ride. In ordinary speech, a person who is "escorted" is not necessarily deprived of freedom of movement. If the military courts did not think that Special Agent Robinson's use of the term carried a special meaning due to the military context, we are not inclined to second guess that interpretation. Accordingly, we see no ground for holding that Brosius's Miranda rights were violated on June 2.

B.

We now consider Brosius's argument that the failure to give him warnings on June 2 violated his rights under Article 31(b) of the UCMJ. As noted, Article 31(b) applies whenever a service member who is "suspected of an offense" is interrogated, whether or not the member is in custody. Statements obtained in violation of Article 31(b) may not be received in evidence at a court martial against the person who made them. 10 U.S.C. S 83(d).

The parties disagree sharply about whether Brosius was a suspect at the time of the June 2 interviews. Brosius maintains that a reasonable investigator would have regarded him as a suspect immediately upon learning that Ivon had driven him back to the base alone in the early morning hours of June 2. The government argues that the agents were focusing on other suspects, chiefly Ivon's estranged boyfriend, and did not regard Brosius as a suspect.

We find it unnecessary to decide whether Brosius was "suspected" of an offense on June 2. Even if he was "suspected" and even if the statements that he provided on June 2 should have been suppressed under 10 U.S.C. S 83(d), the failure to suppress those statements was harmless error. See Hassine v. Zimmerman, 160 F.3d 941, 949 (3d Cir. 1998) (in a habeas corpus proceeding, an error is harmless if it did not have a substantial and injurious effect or influence on the verdict). If the confession that Brosius made on June 4 and 5 is not suppressed, a subject that we discuss below, the statements made on June 2

14

were obviously harmless. As noted, at the June 2 interview, Brosius stated that: 1) PFC Ivon gave him a ride back to the base from a nightclub; 2) another male soldier rode with them; 3) she had a troubled relationship with her boyfriend; and 4) he had last seen her at about 2:55 a.m. on the morning of the murder. These statements added nothing to Brosius's later confession. Indeed, they do not appear to have added much if anything to evidence available from other witnesses or sources. Prior to the June 2 interview, Brosius had told other witnesses who testified at trial that he had driven home with the victim on the night of her murder; that he might have been the last person to see her alive; and that another person had accompanied them in the car. In addition, the log book at a gate revealed that Ivon's car had returned at 2:30 a.m. with two occupants. Accordingly, the failure to suppress evidence obtained during the June 2 interview was harmless under any standard.

Brosius, however, contends that, because warnings were improperly withheld on June 2, his subsequent confession on June 4 and 5 must be suppressed. We cannot agree. In Oregon v. Elstad, 470 U.S. 298 (1985), the Supreme Court considered the appropriate remedy when a suspect in custody is first interviewed without Miranda warnings and is later given proper warnings and interviewed again. In Elstad, the defendant was taken into custody for committing a burglary. Id. at 300-01. He was initially questioned at the scene of the arrest and made an incriminating admission. Id. After he was taken to the police station, Miranda warnings were given, he signed a written waiver, and confessed to the crime. Id . at 301-02. The state appellate court held that, even if the confession had not resulted from actual compulsion, the defendant's initial statement had a coercive impact because it had let the " `cat . . . out of the bag.' " Id. at 303 (citation omitted). The state appellate court consequently held that the later statement had to be suppressed. Id.

The Supreme Court reversed, holding that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of

15

compulsion." Id. at 314. The Court added that "[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." Id. at 314.

That is precisely what occurred here. Brosius made unwarned statements on June 2. He went home, and two days passed. On June 4th, he was called back for a second interview. He was then given proper warnings, and he subsequently confessed. There is no reason to believe that these later statements were not "knowingly and voluntarily made." Elstad, 470 U.S. at 309.

Brosius argues that the circumstances surrounding the interview at the River Building were improper because Brosius was led to believe that Captain Ewing, who was actually a member of the prosecution team, was serving as Brosius's attorney. The government responds that, although Captain Ewing had previously represented Brosius in an unrelated matter, Captain Ewing and the agents made it clear that Captain Ewing was working with the prosecution in relation to the Ivon murder investigation.

Captain Ewing's role at the June 2 interview at the River Building was inadvisable, but it does not call for the suppression of the confession that Brosius provided days later after receiving proper warnings. Brosius relies on the statement in Elstad that a prior failure to warn may call for the suppression of a subsequent statement made after receiving proper warnings if "deliberately coercive or improper tactics" were used in the first interrogation. 470 U.S. at 314. This rule, however, relates to situations in which the tactics used in the first, improper interrogation had a coercive effect that led to the later admissions. Nothing of that sort happened here. As we have noted, Brosius did not provide any new, incriminating information during the interviews on June 2. He was not even in the position of the defendant in Elstad, who had "let the cat out of the bag" when he was initially questioned. Brosius's statements during the June 2 interviews cannot have coerced him to make his subsequent confession.

16

IV.

Brosius's final argument is that his confession should be suppressed under Edwards v. Arizona, 451 U.S. 477 (1981). In Edwards, the Supreme Court held that "an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police." Id. at 484-85. Brosius maintains that he requested counsel during the interview on June 2 and therefore his subsequent questioning without counsel was improper.

We reject Brosius's Edwards argument. Edwards applies only where the suspect makes a request for counsel while in custody. See, e.g., United States v. Wyatt, 179 F.3d 532, 536 (7th Cir. 1999)(citing cases); United States v. Bautista, 145 F.3d 1140, 1146 (10th Cir. 1998); cf. Alston v. Redman, 34 F.3d 1237, 1249 (3d Cir. 1994) (Edwards does not apply where counsel was requested outside the context of "custodial interrogation"). Here, because Brosius was not in custody on June 2, Edwards does not apply.

V.

For these reasons, we affirm the order of the District Court.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

17