UNITED STATES, Appellee,

v.

Darrell J. MUIRHEAD, Machinery
Repairman Second Class, U.S.
Navy, Appellant.

No. 98–0658.
Crim.App. No. 96–1211.

U.S. Court of Appeals for
the Armed Forces.

Argued May 11, 1999.

Decided July 28, 1999.

COX, C.J., delivered the opinion of the Court, in which SULLIVAN, CRAWFORD, GIERKE, and EFFRON, JJ., joined.

For Appellant: *Lieutenant Frank M. Doherty*, JAGC, USNR (argued); *Major Stephen D. Chace*, USMC (on brief); *Lieutenant Syed N. Ahmad*, JAGC, USNR.

For Appellee: *Lieutenant Commander JoAnn W. Melesky*, JAGC, USN (argued); *Colonel Kevin M. Sandkuhler*, USMC, and *Commander Eugene E. Irvin*, JAGC, USN (on brief); *Commander D.H. Myers*, JAGC, USN, and *Lieutenant Janice K. O'Grady*, JAGC, USNR.

Chief Judge COX delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members found appellant guilty, contrary to his pleas, of assault with intent to inflict grievous bodily harm, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928. The adjudged and approved sentence provided for a bad-conduct discharge, 2 years' confinement, forfeiture of $854.40 per month for 2 years, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and all of the, except for a portion of the forfeitures found to be ambiguous.[1] 48 MJ 527, 540 (N.M.Ct.Crim.App.1998).

This Court granted review of three issues. Our resolution of Issue II is dispositive of the case.[2]

## II

WHETHER THE MILITARY JUDGE ERRED WHEN HE DENIED APPELLANT'S MOTION TO SUPPRESS STATEMENTS TAKEN IN VIOLATION OF ARTICLE 31, UNIFORM CODE OF MILITARY JUSTICE.

We find the military judge erred to the substantial prejudice of appellant by denying his motion to suppress his statements taken in violation of Article 31(b), UCMJ, 10 USC § 831(b). Accordingly, we reverse.

## I. FACTS

On November 6, 1994, at approximately 9:30 p.m., appellant took his 6–year old stepdaughter, M.D., to the emergency room at the United States Naval Hospital, Guam, because she was bleeding from her vaginal area. M.D. was wearing a nightie and underwear at the time of her admission to the hospital. The treating physician, Commander (CDR) Mark Ralston, asked appellant what had happened. According to CDR Ralston, appellant said M.D. had been with her mother during the day. Appellant had come home from work at approximately 6:30 p.m. and stayed with M.D. while her mother went out with friends. Appellant noticed M.D. was bleeding at around 8:30 p.m., and M.D. told him that she had placed a mop handle in her "puki."[3] Appellant told CDR Ralston he thought the injury was accidental.

CDR Ralston attempted to question M.D. about her injury but found her to be "silent, tearful, and nervous." Upon examining her, CDR Ralston considered the injury nonaccidental, contrary to appellant's opinion. Following standard operating procedures, CDR Ralston took steps to notify the Naval Criminal Investigative Service (NCIS), Child Protective Services, and a naval hospital photographer.

CDR Ralston and an emergency room nurse then performed a rape kit examination

1. The court-martial sentenced appellant, in pertinent part, to "forfeit all pay and allowances, which is $854.40 per month for 2 years...." The Court of Criminal Appeals found this portion of the approved sentence to be ambiguous and affirmed only the unambiguous portion, namely, forfeiture of $854.40 pay per month for 2 years.

2. Granted Issues I and III are as follows:

I

WHETHER THE MILITARY JUDGE ERRED WHEN HE ADMITTED HEARSAY AS SUBSTANTIVE EVIDENCE.

III

WHETHER THE MILITARY JUDGE COMMITTED PLAIN ERROR WHEN HE DID NOT EXCLUDE AN EXPERT'S TESTIMONY THAT THE INJURY TO THE CHILD WAS THE RESULT OF CHILD ABUSE.

3. The record indicates that M.D. used "puki" and "pik-pik" as terms to describe her pubic area.

of M.D. After the rape kit examination was completed, CDR Ralston told Special Agent Dwayne Daley of NCIS that M.D. had signs of possible sexual abuse. Although CDR Ralston did not remember specifically telling Agent Daley that he suspected appellant of sexually abusing M.D., he attempted to convey his suspicions in that regard to the agent. Sometime after midnight, CDR Ralston relayed to Special Agent Bonnie Brady, also of NCIS, that his findings were tantamount to a finding of sexual abuse and suggested that appellant's house be searched. CDR Ralston placed M.D. in a medical hold status because he suspected M.D.'s injury resulted from child abuse.

Agents Daley and Brady went to appellant's home and obtained a consensual search authorization from appellant. On the consent form, the agents inserted the phrase "suspected child abuse" as the reason for the search. During and immediately after the search, Agent Brady interviewed appellant without reading him his rights under Article 31(b). The military judge denied appellant's motion to suppress the statements obtained in violation of Article 31(b), and the Government used those statements against appellant at his court-martial. According to Agent Brady's testimony, appellant said he arrived home that evening and began to argue with his wife, whereupon she stormed out of the house, leaving M.D. with appellant. Appellant watched television and washed clothes while M.D. played around the house. At approximately 8:30 p.m., appellant told M.D. it was time for her to go to bed, and M.D. went upstairs to bed. Shortly after appellant went to bed, at approximately 9:00 p.m., appellant heard M.D. going into the bathroom and rustling around in the drawers in her room. Upon investigating, appellant went into M.D.'s bedroom and saw her placing her underwear into the pocket of her pants. After appellant took the underwear out of M.D.'s pocket, he discovered they were covered in blood. He then noticed M.D.'s bleeding, cleaned her with a towel, and took her to the hospital.

Agent Brady also testified that appellant said he never heard M.D. scream that night. She also said he found the mop between the dining room table and the living room area, saw no blood in that area, and assumed M.D. had cleaned up the blood after she hurt herself there. Furthermore, Agent Brady testified appellant told her M.D. used a sanitary napkin to control her bleeding, and appellant said the child might have stuck the mop handle into her vagina because she was "horny."

## II. ANALYSIS

### A. Failure to Give Rights Advisement

■ Article 31(b) provides:

No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

By its terms, Article 31(b) applies to a person suspected of an offense. The determination of whether a person interviewed is a suspect is a question of law. *United States v. Good,* 32 MJ 105, 108 (CMA 1991); *United States v. Meeks,* 41 MJ 150, 161 (CMA 1994). A military judge considering the question of whether a person is a suspect uses an objective standard. The question is whether a reasonable person would consider someone to be a suspect under the totality of the circumstances. *United States v. Meeks, supra; United States v. Schake,* 30 MJ 314, 317 (CMA 1990). On appeal, the military judge's decision on whether the person being questioned was a suspect is reviewed de novo. *United States v. Miller,* 48 MJ 49, 54 (1998). Of course, in some cases, a subjective test may be appropriate; that is, we look at what the investigator, in fact, believed, and we decide if the investigator considered the interrogated person to be a suspect.

■ In ruling on appellant's motion, the military judge stated that, although the injury to M.D. suggested the possibility of abuse, the NCIS agents did not believe that appel-

lant was a suspect; nor that there were enough facts to lead them to reasonably believe that appellant should be considered a suspect. The Court of Criminal Appeals affirmed the trial judge's ruling, relying heavily on the fact that both NCIS agents testified they did not consider appellant to be a suspect when the statements were obtained. 48 MJ at 536–37. The court emphasized that both agents were "[w]ell trained and experienced" and would not have allowed appellant to accompany them in the search; nor would they have interviewed appellant in any location except their offices if they had considered him a suspect. The court noted that appellant did not consider himself a suspect under the circumstances. Further influencing the court's decision was the fact that none of appellant's statements were reduced to writing; nor were they incriminating. *Id.*

The military judge and the court below placed great weight on the subjective opinions of the agents as to whether Article 31(b) rights were required. However, this is the wrong test, for the issue must be viewed objectively. *Meeks,* 41 MJ at 161; *Schake,* 30 MJ at 317.

Our review of the record leads us to conclude that a reasonable person under the circumstances would have considered appellant a suspect, requiring a rights' advisement pursuant to Article 31. Appellant took M.D. to the emergency room hospital; the whereabouts of M.D.'s mother was unknown. CDR Ralston told Agent Brady that the injury to M.D. was suspicious. CDR Ralston also told Agent Daley that M.D. had signs of possible sexual abuse. After talking to Agent Daley, CDR Ralston thought Agent Daley understood that CDR Ralston considered appellant a suspect. After conducting a rape kit examination of M.D., CDR Ralston relayed to Agent Brady that his findings were tantamount to a finding of sexual abuse and suggested to her that appellant's house be searched. The time of day for this communication also highlights the seriousness of the situation. Agent Brady received this information after midnight, but before approximately 2:50 a.m. when the search of appellant's house commenced. Furthermore,

and importantly, the reason for the search was listed on the consent to search form as "suspected child abuse."

Although the agents in their testimony attempted to explain the child abuse entry on the consent form as merely something within the "ballpark" of what they were investigating, this attempted explanation, in conjunction with all of the other circumstances, does not withstand the reasonable person test. A reasonable person would have concluded that appellant was a suspect in the abuse of M.D.—not only a possible perpetrator but also someone who may have been an accessory to the abuse. These experienced agents should have read appellant his rights under Article 31(b) before questioning him. Consequently, the military judge erred when he denied appellant's motion to suppress his statements to Agent Brady.

### B. Prejudice to Appellant

■ The finding of error does not end our inquiry. The admission of appellant's statements must be reviewed using a harmless-error analysis to determine if appellant was materially prejudiced. Error not amounting to a constitutional violation will be harmless if the factfinder was not influenced by it, or if the error had only a slight effect on the resolution of the issues of the case. *United States v. Barnes,* 8 MJ 115–116 (CMA 1979).

■ The evidence against appellant consisted of three out-of-court, inconsistent statements of M.D. identifying appellant as the perpetrator; a stipulation of expected testimony from the treating physician; testimony from an expert on child abuse that contained an opinion on the probable cause of injury differing from that of the defense expert; photographs of the injury to M.D. and of blood found throughout the home; and testimony from the two NCIS agents, during which Agent Brady recounted appellant's unwarned statements.

According to Agent Brady, appellant said he arrived home that evening and began to argue with his wife, whereupon she stormed out of the house, leaving M.D. with appel-

lant.[4] Appellant saw that M.D. was bleeding after he had put her to bed, but appellant did not hear M.D. cry or scream that night. Agent Brady also testified that appellant said he found the mop between the dining room table and the living room area, saw no blood in that area, and assumed M.D. had cleaned up the blood after she hurt herself there. Furthermore, Agent Brady testified that appellant told her M.D. used a sanitary napkin to control her bleeding, and appellant said the child might have stuck the mop handle into her vagina because she was "horny."

These facts were exclusively derived from appellant's statements to Agent Brady. Moreover, it is important to note that M.D. did not testify at trial.[5]

We cannot say in this case, where there was no direct evidence that appellant had committed the offenses, that the admission of appellant's statements through the testimony of Agent Brady was harmless. At first glance, it may appear that appellant's statements were not inculpatory since they did not directly admit the charges. However, appellant's statements supplied the members with a potential motive for his committing the offense; a problematic explanation why no blood was found between the dining room and living room area; an unusual characterization of a 6-year old as to why she would injure herself that way; an unordinary means M.D. used to stop her bleeding; and appellant's denial that he heard M.D. cry out that evening. Under the circumstances, these facts reasonably must have influenced the members during their deliberations and had more than a slight effect on the resolution of the issues in the case.

Accordingly, appellant's testimony had a substantial influence on the findings. *See, e.g., United States v. Adams,* 44 MJ 251, 252 (1996). Although we are mindful of the principle that prejudicial error should be found sparingly, the interests of justice require that this case be reversed since the admission of information derived from appellant's unwarned statements materially prejudiced his right to a fair trial.

## III. CONCLUSION

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

4. When he arrived home on the evening of M.D.'s injury, appellant discovered a message to his wife requesting that she pick up a man named John. Appellant had previously suspected his wife was having an affair, and this revelation added to his suspicion.

5. The defense called M.D. as a witness, but she did not respond to any questions and was ruled unavailable by the military judge.