**Michael Todd BROSIUS, Petitioner,**

v.

**WARDEN, UNITED STATES PEN-ITENTIARY, LEWISBURG, PA., Respondent.**

No. Civ.A.1:CV–99–1387.

United States District Court, M.D. Pennsylvania.

Dec. 13, 2000.

Alan D. Chute, Jones, Day, Reavis & Pogue, Pittsburgh, PA, Paul Michael Pohl, Pittsburgh, PA, for petitioner.

Dulce Donovan, U.S. Attorney's Office, Williamsport, PA, for respondent.

*MEMORANDUM*

CALDWELL, District Judge.

### I. *Introduction.*

In 1990, Michael Todd Brosius, then a member of the United States Army, was charged in a military court-martial with premeditated murder under Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918. He was convicted of unpremeditated murder and sentenced to life imprisonment, later reduced to seventy-five years.

Brosius, an inmate at USP–Lewisburg, Pennsylvania, has filed a counseled petition for a writ of habeas corpus under 28 U.S.C. § 2241. Asserting that he was in custody and also objectively a suspect at the time, he argues that inculpatory statements he made to Army investigators were obtained in violation of his Fifth Amendment right against self-incrimination, and his right to remain silent under both *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and military law at Article 31, UCMJ, 10 U.S.C. § 831(b). He also contends that the statements were obtained after two requests for a lawyer were ignored. Finally, he maintains that the lawyer the Army supposedly provided for him, but who was really a prosecutor and not acting on his behalf, had an ethical conflict that compounds the violations. He has filed a motion requesting oral argument or a hearing on his claims.

### II. *Background.*

At about 4:40 a.m., on June 2, 1990, at a United States Army base in Giebelstadt, Germany, Private First Class Tammy Ivon was discovered near death from multiple stab wounds. She later died from the injuries.

The Army's Criminal Investigation Division (CID) began an investigation that morning. During the course of that investigation, on the evening of June 2, CID officers had a brief interaction with the petitioner and then later interviewed him. He was not advised of his rights on either occasion. The questioning led to additional interviews on June 4 and 5. On those occasions, Brosius was advised of his rights, including his right to remain silent and to have the assistance of an attorney, and he executed signed waivers of his rights. As a result of the questioning on the latter two days, Brosius made a written confession, dated June 6. At the close of this statement, he stated, "I don't believe I did it and if I did I want help. I

feel like I falsified the whole statement." *United States v. Brosius*, 37 M.J. 652, 657 (A.C.M.R.1993). All of the petitioner's statements were used against him at trial. There was no forensic evidence tying him to the crime. *Id.* at 655.

Brosius focuses on the propriety of the June 2 questioning, asserting that this questioning was violative of his constitutional rights and of his rights under military law, tainting the statements given later. For the first time, he also argues in this petition that the questioning on June 4 and 5 was improper because it failed to scrupulously honor his invocation of the right to remain silent on June 2, citing *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

Immediately before the court-martial, the June 2 questioning was the subject of an October 9, 1990, suppression hearing under Article 39(a), UCMJ, 10 U.S.C. § 839(a). CID agents Douglas M. Allen and Mark Nash testified at the hearing, along with the petitioner. After hearing the testimony, the military judge presiding over the court-martial denied Brosius's motion to suppress, making certain findings of fact. We provide the following summary of the hearing, taken from respondent's exhibit 1 in doc. 26 and petitioner's exhibit 2 in doc. 33.

Allen testified at the suppression hearing as to his contact with Brosius on the day of June 2, 1990. Allen and Tyrone Robinson were two of the agents investigating the killing. At that time, the CID already had two suspects, Private First Class David Sparks, Ivon's boyfriend, and Specialist Randy Hestekin, Sparks's roommate. Allen had taken Sparks to the hospital that day for a sexual-assault determination, (Doc. 26 at 138), and Hestekin had returned to the base in the early morning hours with blood on his shirt, signaling another soldier to be quiet when he was seen. (*Id.* at 158).

Allen was interviewing witnesses in the orderly room of "HHP, 8/43" in Giebelstadt, (Doc. 33 at 135), "a whole string of guys waiting to talk." (*Id.* at 136). The first sergeant told the agents "there was a soldier that stated that he was with her the night before," and the first sergeant "asked" if they "wanted to see him." *Id.* They replied, "Yes, if he's in the area you can send him down." *Id.* The first sergeant then "sent him down." *Id.*

Nash testified that no one from the CID requested that Brosius be sent to them. Although not based on personal knowledge, he said that Brosius "approached some of our agents or the First Sergeant" and said that he wanted to provide information. (*Id.* at 152–53).

Brosius testified that he could not remember telling anyone that he had been with Ivon the night before or that he had wanted to speak to the police about it. (*Id.* at 215). He said that he spoke with the CID because someone from the orderly room came to his room and said that the CID wanted to speak to him about it. *Id.*

Brosius came to the orderly room in the evening. He paced around and seemed upset. Allen and Robinson took him into the first sergeant's office. Brosius said that if he saw Sparks or Hestekin, he would do them bodily harm, (*id.* at 138), that Ivon had been like a sister to him. (*Id.* at 147). He also told the agents "he was with Ivon the night before. That there was someone else with them." (*Id.* at 137). She had given him (and the other man) a ride back to the base. (*Id.* at 138). Allen asked who the third person was. According to Allen, Brosius replied, "Well, I don't want to say anything about it." (*Id.* at 137). Allen continued, "He didn't want to tell me because he said that he didn't want to say anything unless his first sergeant or a lawyer or someone with his interests was standing there to hear what we were saying, and writing it down or whatever." (*Id.* at 139, 148). Allen had "several other people to talk to," *id.*, so he told Brosius there were two lawyers at the River Building, and if he wanted to talk to

a lawyer or someone, to go there. (*Id.* at 139).

The River Building was in Wuerzburg, about twenty kilometers away, where the CID office and military police are located. (*Id.* at 148–49). On cross-examination, Allen admitted he did not know why they did not bring the first sergeant in during any questioning if Brosius had mentioned him as a witness. (*Id.* at 146). Allen did not consider Brosius a suspect at that time. If he had he would have advised him of his rights. (*Id.* at 142). Brosius's section sergeant, a supervisory noncommissioned officer, also described as an "acquaintance of Brosius," (*Id.* at 210), drove the petitioner to the River Building. (*Id.* at 148).

Brosius recalled the conversation differently. He testified he said he would not say anything until he had a lawyer present. He did not remember mentioning the first sergeant, although he admitted it was possible. (*Id.* at 206, 215).

At the River Building, CID officer Mark Nash questioned the petitioner. Nash testified as follows. Brosius waited his turn like everybody else. (*Id.* at 150). Like the other interviews, it was conducted in the polygraph suite and a written statement was taken in Nash's office. Nash did not advise Brosius of his rights. (*Id.* at 152). Another CID agent, David Schindler, was also present at the interview. (*Id.*).

According to Nash, Captain Harper M. Ewing, the prosecutor assigned to the case, was also there because Brosius had said that he wanted a "witness" present so that the CID did not misconstrue his words. (*Id.* at 152). Nash told Brosius that Ewing "was with the prosecuting office, and that he was a prosecuting attorney." (*Id.* at 154). Petitioner's response to that was "That's fine." *Id.* Because Brosius appeared nervous, Nash also told him before the interview that Sparks was their main suspect and that if he was "worried about rights or anything being violated, if you start to say anything that we think would be incriminating against

you, we would stop you and advise you of your rights." (*Id.* at 154–55). Petitioner replied, "Okay." *Id.* In the past, Nash had given this same advice to other witnesses and to victims as well. (*Id.* at 167). Nash thought Brosius was agitated because Ivon had been a friend. (*Id.* at 154).

Ewing testified that he told Brosius that he "was working with the cops," (*id.* at 178), so Brosius would know that he "was not there specifically for him." (*Id.* at 179). When asked why he did not simply make that clear, he said that he thought that informing petitioner that he was working with the MPs would be enough. *Id.* He also said that he (Ewing) had been told that one of the CID agents had informed Brosius that he was the prosecutor in the case. *Id.*

On cross-examination, the following exchange occurred:

> Q. ... The phrase, "I want a lawyer because I don't trust the cops because they'll twist my words," did you hear that phrase that day?
>
> A: I think so.
>
> Q: Did you hear Specialist Brosius use that phrase?
>
> A: I think I did, yes, or something similar.
>
> Q: Was that what you thought he wanted a lawyer for?
>
> A. Yes.

(*Id.* at 184).

Brosius testified that he did not remember being told that Ewing was a prosecutor but that Ewing informed him that he "worked with the cops." (*Id.* at 207). Even though Ewing worked with the cops, Brosius still thought Ewing was his assigned lawyer because "a lawyer was a lawyer," (*id.* at 208), because Ewing had worked on a legal matter for him before, (*id.* at 207), and because Ewing was with him while he was being interviewed by Nash and Schindler. (*Id.* at 208). Petitioner never asked Ewing if he had been assigned to him. (*Id.* at 209). Not did he

testify that while he was at the River Building he had requested a lawyer. Additionally, while he was being questioned on June 4 and 5, he never asked to see his "assigned" lawyer, Captain Ewing. (*Id.* at 211).

Ewing did not recognize Brosius, but Brosius recognized Ewing as the lawyer who had assisted him in a civil matter a few years before. Ewing asked Brosius about the civil matter (and apparently satisfied himself that there was no conflict since the previous matter was not related to the criminal investigation). (*Id.* at 178). On June 6, 1990, Ewing was removed as the prosecutor. (Doc. 33, exhibit 5).

Ewing's presence at the questioning in the polygraph suite came about after Captain Robin Hall, senior trial defense counsel, consulted with Major John King, the deputy prosecutor, who approved of Ewing's presence. (*Id.* at 182). In all the other interviews, Ewing stood outside the suite, observing through a two-way mirror. (*Id.* at 166). Nash never thought to have Hall attend rather than Ewing because Brosius was not a suspect or an accused at that time. (*Id.* at 163).

The interview proceeded with Brosius's cooperation. (*Id.* at 155). He gave information freely. (*Id.* at 159). At that time, both Sparks and Hestekin were being held in cells at the MP station. (*Id.* at 157–58). Nash concentrated his questioning on Sparks and his relationship with the victim. (*Id.* at 156). During the interview, Brosius never sought legal advice from Ewing. (*Id.* at 163). He voluntarily made a sketch of the parking lot where Ivon let him out. (*Id.* at 168). Eventually, Brosius did sign a written statement that night about 10:10 p.m. The statement indicated that the victim had given Brosius a ride back to the base from a night club, that she had also given another male soldier a ride back, that she and Sparks had a troubled relationship, and that petitioner had last seen her around 2:25 a.m. on the morning of June 2. (Doc. 33, exhibit 1).

Nash testified that the petitioner was there of his own free will. They never told him he could leave, but he was there simply to help the CID officers. (*Id.* at 159). Brosius left at the end of the interview, returning to his unit. (*Id.* at 161). However, before he left, the CID agents took his clothing because it was the same clothing he had worn to the night club. (Doc. 33, exhibit 4).

According to Nash, petitioner only became a suspect on the morning of June 3 when the CID investigators had a meeting about the case. (*Id.* at 171–72). They focused on him because he had said there was another person in Ivon's car, but the gate guard logs indicated only two persons had been in the car when it returned to the base early on the morning of June 2. (*Id.* at 173). Nash also said there was some other evidence leading to Brosius that could be described by agent Schindler and another agent named Blackmon. (*Id.* at 173). However, this other evidence was never specified. Nash did not detail how the shift in focus to petitioner happened, but he did mention earlier in his testimony that "Hestekin was a very strong suspect until we started verifying his alibis." (*Id.* at 158). Nothing was said about how Sparks was dropped from the investigation.

Nash knew about the logs before he interviewed petitioner, and they were "looking aggressively for that one person" noted by the guards. (*Id.* at 160). Shortly before the interview or just as it began, he found out that Brosius had said there was a third person in the car. (*Id.* at 160–61). He did not consider this suspicious at the time since from his own experience on guard duty, guards can be mistaken. (*Id.* at 161).

Ewing testified that he asked questions only toward the end of the interview. (*Id.* at 180). He asked Brosius about the third person in the car. Brosius gave a graphic description. (*Id.* at 181). Later, Ewing told the CID to track this person down. *Id.*

Ewing did not know that the gate guards had noted only two people in the car until after the interview. (*Id.* at 185). This knowledge "would have led him" in the "direction" of making Brosius a suspect. (*Id.* at 185).

In denying the suppression motion, the military judge made the following findings of fact, in pertinent part:

. . . .

4) At the beginning the CID had two suspects, Sparks and Hestekin.

5) On the morning of 2 June, both of those individuals were apprehended.

6) In the afternoon of 2 June, Special Agent Allen and others began interviewing members of the accused's battery.

7) The accused's First Sergeant, Flynn, told Special Agent Allen that there was a soldier who was in his battery, who was with the victim that night.

8) The CID told the First Sergeant that they wanted to interview this soldier.

9) This soldier was the accused and he was called to the orderly room.

10) The accused there met Special Agent Allen and another CID agent.

. . . .

12) In the office and even outside the accused was pacing. His fists were clenched. He said the victim was like his sister. He wouldn't sit down. He also indicated that he wanted to do bodily harm to Sparks and Hestekin.

13) The accused told the CID that he would talk, but he wanted a lawyer or his First Sergeant present.

14) Allen told the accused if he wanted a lawyer, he should go over to the River Building which is the CID headquarters in Wuerzburg.

15) The accused then went to the CID headquarters with Pickett [the Section Sergeant].

16) At the building the accused met Special Agent Nash.

. . . .

19) The accused spoke briefly with Ewing and reminded Ewing that Ewing had represented the accused in a legal assistance matter about 2 years previous to that time.

20) Ewing told the accused that he was then working with the cops.

. . . .

24) In the polygraph suite the conversation was calm.

. . . .

26) During both interviews the accused mentioned that a third person was in the car with the accused and the victim.

27) Nash at the time believed that the accused was not a suspect.

28) On the next day in the CID meeting, the fact that the accused said there were three in the car, and a gate guard said he only saw two, along with other evidence, caused the CID to believe that the accused should be considered a suspect.

. . . .

37) Special Agent Allen did not suspect the accused of criminal involvement in the death of the victim.

38) There were no grounds for him to do so.

39) He was not required to give the accused a warning.

40) The request for counsel from the accused at that time was not for the purpose of representing him, or to have counsel deal with the police for him.

41) If the accused had a purpose other than as a ploy or ruse, it was to have an impartial observer.

42) At the River Building the accused did speak to Captain Ewing.

43) The accused was clearly advised by Captain Ewing, that Ewing was not representing him.

44) No reasonable man under the circumstances could believe that Ewing was representing the accused.

45) The accused knew that Ewing was not representing him.

46) Agent Nash did not suspect the accused of criminal involvement.

47) Nash had no reasonable grounds to believe that the accused was culpably involved.

48) That the accused said three people were in the car is as readily explainable as the gate guard making a mistake.

49) Ewing did not act in any way as the accused's counsel in the interview in the polygraph suite.

50) The accused's nervousness in Nash's office after the interview when the four were present, was not reasonable grounds to suspect him.

51) After all, his friend had just been murdered.

52) On 4 and 5 June the accused was properly warned of his rights under Article 31 and *Miranda, Tempia.*[1]

53) On those dates the accused voluntarily and knowingly, and intelligently waived all of his rights.

54) The accused testified that he didn't have counsel there because he believed Ewing was his lawyer and working on his behalf.

55) I find this statement to be not factual.

56) I find that the accused knew Ewing was not his lawyer and not working on his case, or in his behalf.

57) I find that the accused was not confused in any way about Ewing's position.

(*Id.* at 224–225) (brackets and footnote added).

The military judge concluded as follows:

To recap, I find as follows:

Neither Allen nor Nash believed, nor reasonably believed, nor should they have reasonably believed, that the accused was a suspect on 2 June 1990. That no ground existed for them to believe that the accused was a suspect.

I find that Ewing did not represent the accused. I find that the accused knew that Ewing did not represent him. I find that the accused never made a request for counsel to advise him or represent him. I find that the request for counsel was, at most, a ploy or a ruse by the accused. At best it was a request for an impartial observer.

I find that the accused properly waived his rights to counsel after being properly advised of all his rights. I find that the accused never requested counsel to represent him, so *Edwards versus Arizona* does not apply.

(*Id.* at 229–30).

There was also some testimony at the investigation hearing held under Article 32, UCMJ, 10 U.S.C. § 832,[2] on which the petitioner also relies. CID agent Schindler admitted they were "walking the gray area" in the way they questioned Brosius. (Doc. 33, exhibit 2 at 782). Nash stated at that hearing: "I'll be honest, sir. I believe that what was stated was, 'That we do have an attorney here. Okay, you requested one. You know—'" (*Id.* at 877).[3]

---

1. *United States v. Tempia,* 37 C.M.R. 249, 1967 WL 4235 (C.M.A.1967), extended *Miranda* to military personnel.

2. An Article 32 hearing is apparently the military counterpart to a grand-jury proceeding.

3. Although at the same time Nash also said that it was made clear to Brosius that Ewing "was working either as a prosecutor or the cops or whatever." *Id.* Also, Nash stated that Brosius's response was: "Okay. That's cool. I just want somebody to witness what I was saying to you guys." *Id.*

III. *Appellate History.*

After his conviction, Brosius appealed to the United States Army Court of Military Review (now the Army Court of Criminal Appeals). Unlike civilian appellate courts, this court has the authority to review the factual findings of the military judge.[4] The petitioner contested, among other things, the military judge's decision not to suppress his statements. Specifically, he argued that Nash should have read him his rights at the River Building because he was then objectively a suspect, he was in custody, and he had asked to see a lawyer. (Doc. 26, exhibit 3 at 6). As part of the argument concerning custody, the petitioner contended that he had to report to the orderly room or he could have been disciplined for failing to follow orders, citing *United States v. Tempia*, 37 C.M.R. 249, 1967 WL 4235 (C.M.A.1967). (*Id.* at 7).

The Court of Military Review rejected this argument on the basis of the following factual recitation:

> Unfortunately for the appellant, the evidence does not support his characterization of the events of 2 June. The appellant was neither in custody nor reasonably suspected of killing PFC Ivon by the CID agents with whom he spoke on that date. The CID agents testified that the appellant voluntarily appeared before them as a friend of PFC Ivon wishing to provide them with information that might lead to the apprehension of her killer. The fact that he was distraught or grief-stricken would not lead a reasonable criminal investigator to have suspected him of an offense since that is not suspicious behavior from a friend of a crime victim.

Moreover, the appellant's request that a lawyer be present while he spoke with the CID did not, under the circumstances, constitute a request for legal counsel even assuming there was a custodial interrogation. Invocation of the right to counsel must be unequivocal and unambiguous. *United States v. Schake*, 30 M.J. 314, 317 (C.M.A.1990); *United States v. Dock*, 35 M.J. 627 (A.C.M.R. 1992), pet. granted, 38 M.J. 173 (C.M.A. 1993). While the appellant said that his purpose for requesting that CPT Ewing be present was to look out for "his interests," in context, he was referring to something other than his potential culpability for the killing. We therefore reject this assigned error as unmeritorious.

*United States v. Brosius*, 37 M.J. 652, 660 (A.C.M.R.1993).

The petitioner then appealed to the United States Court of Military Appeals (now the Court of Appeal for the Armed Forces), raising the same issue. On this appeal, he argued that he was a suspect based on the additional fact that his clothing had been taken after the questioning at the River Building, reasoning that the police do not seize the clothing of witnesses. (Doc. 26, exhibit 6 at 40, 42).

The Court of Military Appeals granted review and then on January 26, 1994, summarily affirmed without opinion the decision of the Army Court of Military Review. *United States v. Brosius*, 39 M.J. 378 (C.M.A.1994). (Doc. 26, exhibit 7).

This habeas petition followed on August 4, 1999.

---

4. At the time of Brosius's court-martial, Article 66, UCMJ, 10 U.S.C. § 866(c), provided as follows:

> (c) In a case referred to it, the Court of Military Review may act only with respect to the findings and sentence as approved by the convening authority. It may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.

Article 66(c) now refers to the Court of Criminal Appeals.

## IV. *Discussion.*

### A. *Standard of Review.*

■ The plurality opinion in *Burns v. Wilson*, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), has been taken as establishing that a civilian court may only review decisions of military courts to determine if the latter gave the petitioner's claims full and fair consideration. *See Levy v. Parker*, 478 F.2d 772, 782–83 (3d Cir.1973), *rev'd on other grounds*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Jordan v. Warden*, 1998 WL 614694, at *2 (M.D.Pa.). If the military courts have done so, then the inquiry is at an end, and the habeas petition must be dismissed. *Lips v. Commandant*, 997 F.2d 808, 811 (10th Cir.1993); *Jordan, supra*, 1998 WL 614694, at *2.

The courts have had some difficulty in applying the "full and fair consideration" test. *See Levy, supra*, 478 F.2d at 781 n. 9 (the test is "easy to state, but difficult to define and to apply") (quoted sources omitted); *Kauffman v. Secretary of the Air Force*, 415 F.2d 991, 997 (D.C.Cir.1969) (the test "has meant many things to many courts"); *Dodson v. Zelez*, 917 F.2d 1250, 1252 (10th Cir.1990) ("The federal courts' interpretation—particularly this court's interpretation—of the language in *Burns* has been anything but clear.").

■ However, it appears that the test has been channeled somewhat by a four-factor analysis expressed in *Calley v. Callaway*, 519 F.2d 184 (5th Cir.1975) (en banc). In *Calley*, the Fifth Circuit stated that before a federal court can act on a habeas petition challenging a conviction under military law, the following factors should be considered:

1. The asserted error must be of substantial constitutional dimension . . .

or so fundamental as to have resulted in a miscarriage of justice.

*Id.* at 199 (italics omitted).

2. The issue must be one of law rather than of disputed fact already determined by the military tribunal.

*Id.* at 200 (italics omitted).

3. Military considerations [must not] warrant different treatment of constitutional claims.

*Id.* (italics omitted) (brackets added).

4. [Whether] [t]he military courts [did not] give adequate consideration to the issues involved and appl[ied] [im]proper legal standards.

*Id.* at 203 (italics omitted) (brackets added). *See also Dodson, supra*, 917 F.2d at 1252–53 (approving use of the *Calley* test and noting that it was presaged by Tenth Circuit cases). We will use this test in disposing of the instant petition.[5]

■ We elaborate here on the second factor. In regard to the facts, we will not reevaluate or reassess the evidence. *See Burns, supra*, 346 U.S. at 144, 73 S.Ct. at 1050, 97 L.Ed. at 1516; *Dodson, supra*, 917 F.2d at 1254; *Jordan, supra*, 1998 WL 614694, at *2 ("It is not the function of the civil courts to reevaluate or reassess the evidence previously presented to the military courts."). We will review certain mixed questions of law and fact, such as whether the petitioner was in custody, *see Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), or a suspect. *See United States v. Muirhead*, 51 M.J. 94 (U.S.A.F.1999); *United States v. Meeks*, 41 M.J. 150 (C.M.A.1994). But we will not disturb the military courts' underlying findings of narrative or historical facts, *see Thompson, supra*, an approach especially proper, of course, when

5. We reject the respondent's contention that the Tenth Circuit in *Lips, supra*, decided after *Dodson*, retreated from the *Calley* test. *Lips* set forth the *Calley* test as part of it analysis. Additionally, the Tenth Circuit has continued to rely on the *Calley* test after *Lips. See Reed v. Hart*, 17 F.3d 1437 (10th Cir.1994) (unpublished disposition in Westlaw at 1994 WL 60398); *King v. Berrong*, 25 F.3d 1057 (10th Cir.1994) (unpublished disposition in Westlaw at 1994 WL 161336). District courts within that Circuit have also done so. *See White v. Nickels*, 2000 WL 1073716 (D.Kan.).

the parties have presented conflicting evidence.

B. *The Petitioner's Claim That He Was a Suspect on the Evening of June 2, 1990.*

■ The Petitioner argues that he became a suspect during his interaction with CID agent Allen on June 2 and was entitled to the rights warnings set forth in Article 31(b), UCMJ, 10 U.S.C. § 831(b). Article 31(b) requires that, before being interrogated, a suspect must be told that he can remain silent and that any statement he makes can be used against him at a court-martial. It provides as follows:

> (b) No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

The Article is the military parallel to *Miranda* warnings, but as noted by the Court of Appeals for the Armed Forces, unlike in the *Miranda* setting, Article 31(b) warnings are required whenever a person is a suspect, not when the person is also in a custodial situation. *United States v. Swift*, 53 M.J. 439, —— (U.S.A.F.2000).

To determine if a person is a suspect, an objective standard is used in most cases. "The question is whether a reasonable person would consider someone to be a suspect under the totality of the circumstances." *Muirhead, supra,* 51 M.J. at 96 (citing *Meeks, supra; United States v. Schake,* 30 M.J. 314 (C.M.A.1990)). However, "in some cases, a subjective test may be appropriate; that is, we look at what the investigator, in fact, believed, and we decide if the investigator considered the interrogated person to be a suspect." *Muirhead,* 51 M.J. at 96.

■ In support of his claim that he was a suspect, Brosius argues the following. First, the CID knew before he was questioned that the victim Ivon had entered the base in her own car and that the gate guards had recorded only one other person in the vehicle. Second, as Nash testified, the CID had already been "looking aggressively for that one person" at the time of the interview. Third, Allen knew that Brosius was that person when the petitioner told him that Ivon had given him a ride back to the barracks. Fourth, Ewing testified that if the CID agents had told him there was a conflict between Brosius's statement that there was a third person in the car and the gate guards' logs, he would have been led to suspect the petitioner.

Further, and most importantly, this conflict concerning the number of persons in the car was the only specific item of evidence the prosecution presented at the suppression hearing as justifying the shift in focus from Sparks and Hestekin on June 2 to Brosius on the morning of June 3. Yet this was not new information; the CID knew it as soon as Brosius told Allen there was a third person in the car. Nash did testify to "other evidence" that aroused their suspicion of the petitioner, but that other evidence was never forthcoming at the hearing and still is not known. Countering the argument the respondent makes below about the two existing suspects, Sparks and Hestekin, the petitioner argues that the existence of other suspects did not make him a nonsuspect, since there is no rule against there being more than one or two suspects in a case.

Moreover, after the questioning was over at the River Building, the CID took the petitioner's clothing for analysis since he told them it was the clothing he had worn to the night club. Because witness clothing is not normally seized, the petitioner presents this as an additional reason that he was objectively a suspect on June 2 and should have been read his Article 31(b) rights.

In opposition, the respondent argues that Brosius could not reasonably have been considered a suspect on June 2. First, both Allen and Nash testified that neither one considered him a suspect. Second, the totality of the circumstances support their testimony. On June 2, the CID already had two suspects, Sparks, Ivon's boyfriend, and Hestekin, Sparks's roommate. At the time, it was known that Sparks had a troubled relationship with Ivon and that Hestekin had returned to the barracks on the morning of the murder with blood on his shirt, signaling another soldier to be quiet when he was seen. Both of these men had been read their rights and both were being held in custody. Sparks had been sent to the hospital for a sexual-assault determination.

Further, Nash's questioning focused on Sparks, not Brosius. And Brosius's responses would not have diverted that focus; Brosius was cooperative, providing incriminating evidence about Sparks and even remarking that he wanted to do harm to Sparks and Hestekin. He voluntarily made a sketch of the parking lot where Ivon let him off.

Additionally, as Nash testified, the conflict between the gate guards' logs and Brosius's statement that there was a third person in the car would not, and did not, arouse suspicion because the guards could have been mistaken by not seeing the third person.

Finally, the respondent points to one specific circumstance that did change by the morning of June 3, although not relied upon by the military judge or the appellate military courts; Hestekin's alibis were proving to be true, thus leading investigators to consider Brosius.

We reject the petitioner's claim that he was a suspect at any time on June 2. Using the fourth *Calley* factor, we conclude the military courts applied the proper legal standard to this military-law issue and gave it full and fair consideration, even if other jurists might have decided it differently.

■ The petitioner has hinged his argument on whether he should have been considered a suspect under an objective standard. This is generally the test to apply. However, under military law, as noted in *Muirhead, supra,* "in some cases, a subjective test may be appropriate; that is, we look at what the investigator, in fact, believed, and we decide if the investigator considered the interrogated person to be a suspect." 51 M.J. at 96. The only limitation on this standard is that reliance cannot be made on the bare representation of the investigators that they did not consider the defendant a suspect. *Id.* at 97 (disapproving of heavy reliance on such statements). It is apparent that the military courts implicitly took into account the subjective beliefs of agents Allen and Nash, and that it was proper to do so in this case.

The military judge made certain central findings on this issue. He found that both Allen and Nash did not believe that Brosius was a suspect on June 2. This was an entirely proper finding as to Allen since nothing in the record indicates that he personally knew about the gate-log entry. The conclusion was further supported as to Nash because the conflict with Brosius's statement was explainable by a gate guard's mistake. Additionally, Brosius's agitated condition would not have arouse suspicion because it was normal for someone who had just lost a friend.

The other findings also support an honest belief on the part of investigators that Brosius was not a suspect. As detailed above, the CID already had two valid suspects in custody, Sparks and Hestekin. The petitioner met Allen while Allen was interviewing a number of soldiers and was apparently ready to supply Allen with incriminating evidence on Sparks. Brosius did in fact supply that information, along with threats to Sparks and Hestekin. Thus, there was objective evidence in the record to support the agents' personal belief that Brosius was not a suspect.

We note that the petitioner relies on the seizure of his clothing at the end of the June 2 interview at the River Building to support his claim that he had to have objectively been a suspect on that date. This argument was presented on appeal to the Court of Appeals for the Armed Forces and rejected. Given the totality of the circumstances test we must apply here, we will not disturb the conviction on this basis alone since we can only decide whether the military courts gave full and fair consideration to the claim, not whether we would have made the same decision in their place. That the court's affirmance was without discussion does not affect our conclusion. *See Watson v. McCotter,* 782 F.2d 143, 145 (10th Cir.1986); *Jordan, supra,* 1998 WL 614694, at *3.

C. *The Petitioner's Claim That he Was in Custody, and Subjected to Custodial Interrogation, on June 2, 1990.*

■ The Petitioner argues that he was in custody when he entered the orderly room on June 2, 1990, to meet with CID agents Allen and Robinson, and continued in custody until the end of the interview with CID agent Nash at the River Building. In support, he relies on the exchange between Allen and Brosius's first sergeant when the first sergeant asked Allen if the CID agents "wanted to see" Brosius, and the reply was "Yes, if he's in the area you can send him down." The first sergeant then "sent him down." Brosius was then taken to the River Building by his Section Sergeant. At the River Building, Nash took over the questioning and did not tell Brosius he could leave at any time.

The petitioner also relies on the military judge's findings of fact. The military judge made the following findings of fact bearing on the custody issue:

7) The accused's First Sergeant, Flynn, told Special Agent Allen that there was a soldier who was in his battery, who was with the victim that night.

8) The CID told the First Sergeant that they wanted to interview this soldier.

9) This soldier was the accused and *he was called to the orderly room.*

. . . .

15) The accused then went to the CID headquarters with Pickett [the Section Sergeant].

(Doc. 26 at 225–26) (brackets added) (emphasis added by the petitioner).

In opposition, the respondent asserts that the exchange between the first sergeant and Allen did not result in an order. Additionally, Allen let Brosius leave to seek a lawyer at the River Building, and while he was driven there by his first sergeant, the first sergeant was an acquaintance of his. Further, after Nash completed the questioning at the River Building, Brosius left and returned to his unit. The respondent maintains that this was not custody.

The respondent cites no case law in his support. Brosius relies on *Tempia, supra,* 37 C.M.R. 249, 1967 WL 4235, and *United States v. Granda,* 29 M.J. 771 (A.C.M.R. 1989).[6] We think the petitioner reads too much into these cases. In *Tempia,* the Army Court of Military Appeals held that when a suspect "was ... called to" the investigator's office, 37 C.M.R. at 252, 1967 WL 4235, "for interrogation," *id.* at 256, 1967 WL 4235, there was custodial interrogation, requiring *Miranda* warnings. The court stated:

The test to be applied is not whether the accused, technically, has been taken into custody, but, absent that, whether he has been "otherwise deprived of his freedom of action in any significant way." *Miranda, supra,* at page 444, 86 S.Ct. 1602. Here, the accused was clearly summoned for interrogation.

---

6. He also cited the concurring opinion of Judge Cox in *United States v. Lincoln,* 42 M.J. 315, 322 (U.S.A.F.1995).

Had he not obeyed, he would have undoubtedly subjected himself to being penalized for a failure to repair. Code, *supra,* Article 86, 10 U.S.C. §§ 886; Manual for Courts–Martial, United States, 1951, paragraph 127b. In the military, unlike civil life, a suspect may be required to report and submit to questioning quite without regard to warrants or other legal process. It ignores the realities of that situation to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action. *See People v. Kelley,* 66 Cal.2d 232, 57 Cal.Rptr. 363, 424 P.2d 947 (1967). Hence, we conclude there was "custodial interrogation" in this case.

*Id.* at 256, 1967 WL 4235.

*Granda* dealt with the issue of whether the CID had initiated contact with a suspect who had previously invoked his *Miranda* rights. In *Granda,* the Army Court of Military Review held that when the suspect's commander was "requested" to send the suspect to the CID office for interrogation, the suspect had been ordered to report to the office and the subsequent questioning had thus been initiated by the CID.

For Brosius, these cases provide support only for the proposition that when Allen told the first sergeant to "send him down" to the orderly room and the first sergeant did so, Brosius was ordered to appear before the agents. But these cases do not say that an order by itself creates custody, and in both cases, unlike here, the defendant was a suspect who had been ordered to appear for interrogation.

As established above, Brosius was not a suspect on June 2, and the real issue is not whether he had been ordered to appear but, as *Tempia* noted, whether he had been deprived of his freedom of action in any significant way. Contrary to the petitioner's assertion, an order to appear does not automatically place a soldier in custody. In the Fourth Amendment context of a seizure of the person, obeying an order to report is only "one of the factors to consider under the totality of the circumstances, in determining whether a seizure has occurred." *United States v. Thomas,* 21 M.J. 928, 933 (A.C.M.R.1986). Thomas cited *United States v. Schneider,* 14 M.J. 189 (C.M.A.1982), also a Fourth Amendment case. In *Schneider,* the Court of Military Appeals decided that there was probable cause to take a suspect into custody, and hence his seizure was legal, but felt the need to state that:

·In reaching our decision we do not wish to be thought to hold that every interrogation at the "police station" amounts to custodial interrogation. The conditions under which an accused comes to the office bear examination: Did he report voluntarily? Was he ordered to report? Was he brought in under guard? Was he a suspect? Further, what relation do these conditions have to the interrogation? Was the accused free to leave at any time? May he depart by himself? Must he remain under guard? Lastly, do these conditions directly relate causally to the accused's decision to make a confession?

*Id.* at 195 (footnote omitted).

In the instant case, as noted by the respondent, the petitioner was cooperative at all times, eventually leaving at the end of the interview at the River Building to return to his barracks. He was never told he could leave, but he never asked to leave, which was consistent with a witness cooperating with authorities, not a suspect.

Additionally, we cannot ignore the factual finding of the Army Court of Military Review, concluding that "the appellant voluntarily appeared before [the CID agents] as a friend of PFC Ivon wishing to provide them with information that might lead to the apprehension of her killer." 37 M.J. at 660 (brackets added). This finding has a basis in the record from Nash's testimony.

We conclude that we should not disturb the military courts' ruling that Brosius was not in custody.

### D. *The Petitioner's Request For Counsel.*

■ Citing *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), Brosius argues that counsel should have been appointed for him after he requested a lawyer twice, first in the orderly room and, second, at the River Building. Despite the military courts' finding that the first request was ambiguous, he insists that the circumstances indicate he clearly requested counsel at that time. He also argues that, in any event, the second request was unequivocal.

He also maintains that the military courts applied an incorrect legal standard to the request for counsel by examining the motive for the request. He contends that the request should have been honored once it was made and that his motive for seeking counsel was irrelevant. Further, in any event, the military courts' proffered motives, an impartial observer and someone to look out for the petitioner's interests, were proper ones for seeking an attorney, to guard against police intimidation and to preserve an accurate record of what Brosius said to the CID agents.

The petitioner further maintains that the refusal to provide counsel was compounded by the deception of having Ewing in the room to create the impression that the CID had provided counsel by Ewing's presence.

In opposition, the respondent argues that Brosius was neither a suspect nor in custody when he made an ambiguous request for a lawyer in the orderly room. It was equally a request for his first sergeant, and in this sense was not a request for counsel at all since he would have been equally satisfied with his first sergeant. Thus, the CID was not obligated to provide him with an attorney. He next argues that Brosius never requested a law-yer when he was at the River Building because the sole support for this contention, Ewing's testimony, concerned the ambiguous request in the orderly room, not a second request at the River Building.

Additionally, as the military judge's findings of fact indicate, respondent contends that Brosius knew Ewing was not his lawyer and did not act as if he were. Ewing had identified himself as "working with the cops," and Brosius never treated him as his lawyer, for example, by consulting with him during the interview at the River Building.[7]

We reject the respondent's assertion that there was no second request for counsel. The military judge so found and we accept that finding. However, we do agree with him that this claim must fail because both requests for counsel were made in a noncustodial setting, as determined by the military courts after full and fair consideration of the claim (and when the petitioner was not a suspect as well). Additionally, assuming *Miranda* applies here (which it does not), the first request was ambiguous, and thus could not be a valid request for counsel.

*Miranda* only applies to suspects in a custodial setting, so a request for counsel in a noncustodial setting does not obligate law enforcement officers to ensure counsel is present. *See United States v. Hayes*, 231 F.3d 663, 2000 WL 1672631, at *10 (9th Cir.2000) (*Miranda* rights do not apply to a voluntary conversation with a co-operating witness); *Alexander v. Connecticut*, 917 F.2d 747, 751 (2d Cir.1990) (Fifth Amendment right to counsel did not attach because defendant's admissions were made in a noncustodial setting). *See also United States v. Myers*, 123 F.3d 350, 359–60 (6th Cir.1997). The petitioner's reliance on *Davis, supra,* and *Edwards, supra,* is misplaced because those cases dealt with suspects in custodial settings.

---

**7.** The respondent also asserts that Brosius acknowledged that he knew Ewing was "the" prosecutor in the murder case. We reject this because the record shows that Brosius only knew that Ewing was a prosecutor, and not the prosecutor in the case.

As the respondent also points out, the first request for counsel was ambiguous. Contrary to Brosius's position, the military judge found that the petitioner had asked for the presence either of a lawyer or his first sergeant, a finding not disturbed on appeal. This is an ambiguous request for counsel that triggers no Fifth Amendment rights. *See Davis, supra.*

We also think that the respondent's argument, that Brosius would have been satisfied with his first sergeant as well as with a lawyer, provides us with a correct interpretation of the Army Court of Military Review's analysis of this issue, although the respondent did not explicitly put it that way. The court spoke of Brosius's intent in seeking counsel, 37 M.J. at 660, but, in context, with an earlier reference on the same page to the request for counsel or the first sergeant, the conclusion was that Brosius was asking for someone, not necessarily a lawyer, to look out for his interests.

Based on the foregoing, we need not discuss the petitioner's argument on Ewing's conflict of interest, at least not in a Fifth Amendment context. We also note here the military judge's factual findings that the petitioner knew that Ewing was not his lawyer and not working on his case or on his behalf.

E. *The Claim that Brosius Invoked His Right To Remain Silent.*

The petitioner also claims that the CID ignored the invocation of his right to remain silent. However, the record shows that he was willing to speak and cooperated with the investigators.

V. *Conclusion.*

We have considered the petitioner's remaining arguments, and although not specifically discussed, we find them without merit, including the claim that the military judge was biased and the claim that the military courts failed to make factual findings, based certain findings on speculation, and left open certain legal conclusions.